**Gerald L. NAEKEL, Petitioner,**

v.

**DEPARTMENT OF TRANSPORTATION, Respondent.**

**Appeal No. 85–2350.**

United States Court of Appeals, Federal Circuit.

Jan. 17, 1986.

Gerald L. Naekel, pro se.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Robert A. Reutershan and Richard W. Oehler, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., for respondent; Mary Jones, Office of Gen. Counsel, F.A.A., of counsel.

Before BENNETT, NIES and NEW-MAN, Circuit Judges.

NIES, Circuit Judge.

Gerald L. Naekel *pro se* appeals from the final decision of the Merit Systems Protection Board, Docket No. DE07528210125 remand 27 M.S.P.R. 496, sustaining the Federal Aviation Administration's decision to remove him from his position as an Air Traffic Control Specialist for submitting false information in connection with an application for employment. We reverse.

## Background

Gerald Naekel has been employed in aviation since 1966 as a military and civilian pilot, flight instructor, and FAA air traffic controller. It is uncontested that his civilian and four year military career, including service in Vietnam, has been exemplary in performance. Since 1975, petitioner has sought a position as an air traffic controller preferably in a western state facility in his home area. He was employed with FAA from June 1975 to December 1977 at the Minneapolis Air Route Traffic Control Center. He voluntarily resigned because of harassment by the air traffic controller's union (PATCO) after he filed a successful action against the union for distributing material inside the facility suggesting, *inter alia*, that non-union people should not receive extra training. Over the next year, while he was again employed as a civilian pilot (including a one-month job with a private carrier, Air Oregon), he repeatedly sought reinstatement in a western state FAA facility where union membership was not so strong. In early 1979, he accepted employment through the Chicago Flight Service Station of FAA as a "trainee" and reported to Oklahoma for FSS training. Because of a conflict over where he could bid for a position, which will be discussed, his employment with FAA ended during the summer of that year. He was em-

ployed next by the State of Oregon (Military Affairs Department) and then in commercial aircraft sales. Following the Air Traffic Controllers strike in August 1981, he reapplied in September for a position as an Air Traffic Control Specialist in Denver, was hired, and began work on December 13, 1981. He was removed on March 4, 1982, for "submitting false information on official government documents," that is, on his applications for employment.[1] Specifically, he was charged with falsely answering that within the last five years (1) he had not been fired from any job for any reason, and (2) that he had not quit a job after being notified that he would be fired. The charges relate to separate incidents. The agency asserted that Naekel was fired from a position with Air Oregon in 1978, and that he resigned from FAA in September, 1979, under threat of removal. On appeal to the MSPB, Naekel's removal for falsifying his employment application was eventually upheld.[2] He filed a timely appeal to this court.

### Issue

To sustain a charge of "[s]ubmitting false information on official government documents," the agency must prove by a preponderance of the evidence that the employee knowingly supplied wrong information, and that he did so with the intention of defrauding the agency. *See Tucker v. United States,* 624 F.2d 1029, 1033, 224 Ct.Cl. 266 (1980). The dispositive issue in this case is whether substantial evidence supports the presiding official's decision that the agency proved both elements of the charge with respect to the incidents in question.

### Air Oregon

As indicated above, after leaving the FAA at the end of 1977, Naekel filed a

number of applications seeking reinstatement. On one or more applications he listed a brief period of employment at the end of 1978 with Air Oregon and stated he had been fired from the job. It was listed, for example, on the application which led to his re-employment with FAA in 1979. His explanation for failure to include the Air Oregon job in his 1981 applications is two-fold. First, he did not believe temporary employment, not material to attaining the government position applied for, need be included in a statement of qualifications. Second, he reasonably believed, as a result of legal advice received between the 1979 and 1981 applications, that he had not, in fact, been "fired" in view of the circumstances leading to his leaving Air Oregon.

The agency argued that every firing—even from a short-term position—had to be reported. To prove Naekel was fired it relied on his prior statements on various applications, a 1979 affidavit from an Air Oregon official (given during a check in connection with his earlier employment by FAA) stating that Naekel had been fired, and a statement in a letter Naekel wrote in 1979 bringing Air Oregon's safety violations to the attention of the FAA.

There is no direct evidence of wrongful intent. However, the presiding official ruled that Naekel had been fired from Air Oregon and that his intent was inferrable from "circumstantial evidence."

There appears to be no dispute that Naekel's Air Oregon employment ended following his refusal to land a flight at the La Grande, Oregon airport during bad weather. Naekel was given an ultimatum by an Air Oregon official (not in La Grande) while he was in the air on that flight. Naekel was at the time of the incident a seasoned pilot. He had earned nu-

---

1. The subject applications, SF–171's, are dated September 17, 1981, and December 28, 1981. The purpose of the December application is not explained.

2. Mr. Naekel's arduous ascent into this court spans greater than three years of less than exemplary administrative review, including four

opinions and orders of the board. We would at this point indulge in an examination of the variety of harmful procedural errors alleged by Mr. Naekel to have occurred throughout the administrative process, were it not for our disposition of the case on the grounds detailed *infra.*

merous commendations in Vietnam, which are listed on his discharge papers as DFC/ARCOM/GCM/NDSM/VSM/BSM (3 awards)/AM (35 awards)/VCM w/6/Dev. Naekel testified that, in his opinion, it would have been illegal and would have recklessly endangered the safety of himself and his passengers had he followed Air Oregon's order. His testimony is supported by his report of the incident as a safety violation to FAA dated November 19, 1978 (contemporaneous with the incident), in which he stated:

> This past Friday night, November 17, I find myself making a decision that immediately cost me my job and I knew it would. Had I followed a direct order that was contrary to my decision it might have cost someone their life.... and I think you should look into the matter.

> \* \* \* \* \* \*

> I was fired because I would not land at the La Grande airport to pick up waiting bank material for the U.S. bank system.

The presiding official utilized the above statement against Naekel as an admission that he had been "fired" and, thus, Naekel's answer was not only wrong, but knowingly false. That conclusion was buttressed, in the opinion of the presiding official, by earlier SF–171's which listed the job and stated that he had been fired and by the affidavit from Air Oregon.

█ As recognized by the presiding official, a charge of falsification of a government document requires proof not only that an answer is wrong, but also that the wrong answer was given with intent to deceive or mislead the agency.[3]

The fact of an incorrect response cannot control the question of intent. Were a bare inaccuracy controlling on the question of intent, the "intent" element of the charge would be subsumed within the distinct inquiry of whether the employee's answer

adheres to the true state of facts. A system of real people, pragmatic in their expectations, would not easily tolerate a rule under which the slightest deviation from truth, would sever one's tenuous link to employment. Indeed, an SF–171 does not require absolute accuracy. Instead, an employee must certify that the answers are "true, complete and correct to the best of my knowledge and belief, and are made in good faith." No more than that can reasonably be required. The oath does not ask for certainty and does not preclude a change in one's belief.

█ In the present case, there exists no evidence of record which directly establishes Mr. Naekel's intention to deceive or mislead the FAA. However, there seldom is such direct evidence. As recognized in *Tucker, supra,* circumstantial evidence must generally be relied upon to establish intent. *Id.* 624 F.2d at 1033. Thus, it was appropriate for the board to consider whether the evidence of record as a whole gave rise to an inference that Mr. Naekel possessed the requisite intent at the time he submitted his SF–171's. However, the agency's burden of proving the facts of its case remained the same, whether intent was proved directly or derived inferentially from circumstantial evidence. Either way, the fact sought to be proved must be supported by the preponderance of the evidence. Likewise, the substantial evidence standard by which this court must review findings of fact by the board (5 U.S.C. § 7703(c)(3) (1982)) is constant, whether that fact is supported directly or inferentially. With regard to each fact challenged on appeal, we must determine whether, considering the record as a whole, the board's decision was unreasonable that the agency satisfied its evidentiary burden. *See Jackson v. Veterans Administration,* 768 F.2d 1325, 1330 (Fed.Cir.1985).

---

**3.** *See, e.g., Lacapurcia v. Department of the Army,* 27 M.S.P.R. 514 (1985) (falsification of time cards); *McCreary v. Office of Personnel Management,* 27 M.S.P.R. 459 (1985) (falsification of an SF–171); *Betts v. Department of the Army,* 23 MSPR 37 (1984) (falsification of an

SF–171); *Cadena v. Department of Justice,* 3 MSPB 390, 3 M.S.P.R. 304 (1980) (falsification of employment documents) and cases cited therein. In each, the board required proof of the employee's intent.

In connection with the Air Oregon incident, it is apparent that the agency's proof was directed almost exclusively to the question of whether Mr. Naekel had, in fact, been fired from that position. The board found that he had been, and, although it is certainly not clear, we accept for the purposes of this appeal that the evidence is sufficient to support that finding.[4] The decisive inquiry, therefore, is whether Mr. Naekel intentionally deleted this information from his employment forms with the intent to deceive the FAA. On that question, the evidence of record in this case is woefully inadequate to give rise to an inference of intent which would satisfy the agency's evidentiary burden of proof.

Essentially, the only evidence from which to conclude there was deceptive intent is that offered in support of the fact that Naekel had been fired, and his omission of that fact from his employment form. Under some circumstances bad faith may reasonably be based solely on such facts. However, there is no *per se* evidentiary rule that the omission of a firing establishes intent to deceive. All of the evidence must be considered.

Since the inquiry here was triggered by a statement by Naekel on an earlier SF–171 that he had been fired by Air Oregon, it is difficult to perceive how the agency was misled at all. A simple comparison of Naekel's various SF–171's reveals that some show a period of unemployment of approximately one month during a 16-year career and others show a job with Air Oregon during that time. As explained by Naekel, the Air Oregon job involved no formal hiring or firing. It was a fill-in job with no permanent employment benefits. He was paid when he was scheduled. Nothing in the record contradicts his description of the nature of the position. Had he not been fired from the job, its omission would not have raised any question of an incomplete record since the form states at the top that an applicant need only "account for periods of unemployment exceeding three months." It is not the mere omission of the job, but his answer that he had not been fired in the last five years from any job, that is the alleged offense. The agency asserts that the latter question is unrelated to the length of time one was in the position. In our view, the form is far from clear. It is not wholly unreasonable to believe that no questions relate to a fill-in job.

Another factor in Naekel's favor is that he had more than once disclosed to FAA that he had been "fired" from the Air Oregon job without an adverse effect on his certification for employment. It was entirely reasonable for him to believe that the temporary flying job was not material. Drawing an inference that Naekel expected to conceal his Air Oregon employment on subsequent SF–171's is unsupportable here. The most routine check of his personnel file would disclose the position, as it did. Given the FAA's desperate need for air controllers in the fall of 1981, it is patently ridiculous to conclude that the Air Oregon firing would have affected the agency's employment decision on Naekel more than it had in 1979. His firing after three weeks at Air Oregon appears as no more than an aberration in an otherwise more than satisfactory career record.

Finally, there is positive evidence supporting Naekel's good faith. The record contains Naekel's testimony that, by the time he filled out the subject applications, he no longer believed he had been "fired." He supported the reasonableness of his belief with a plausible explanation, based upon advice from two outside sources, one an attorney, to the effect that an illegal ultimatum cannot result in a lawful firing. Growing precedent supports this legal premise. *Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975); *see also Novosel v. Nationwide Insurance Company,* 721 F.2d 894 (3rd Cir.1983) for an extensive review of case law.

In any event, assuming that Naekel was legally fired despite his belief to the con-

---

**4.** Anomalously, the presiding official states that she did not pass on the "merits" of the firing.

trary, the board's inference of his intent to deceive or mislead the FAA concerning this employment is unsupported by substantial evidence.

### Chicago FSS

██ The agency's case for asserting that Naekel resigned from employment with FAA in 1979 while under a formal proposal to remove him rests on a notice of proposed removal dated September 5, 1979; Naekel's letter of resignation dated September 15, 1979, and Naekel's statement that he had never resigned while under threat of removal.

The apparent ironclad case against Naekel, however, rests on a bizarre set of circumstances. Moreover, his answers on the SF–171 were not as simplistic as the agency would have it. Naekel reported his 1979 employment with Chicago FSS as ended because it was "mutually unsatisfactory," a statement much closer to the truth than the agency's position that he "resigned" while facing a *"proposed* removal." By the time the proposed removal and resignation occurred, Naekel's employment by the agency had already ended.

By way of background, Naekel's home was in Oregon at the time he was hired through the Chicago FSS in early 1979, and he was directed to report to Oklahoma City for training. Sometime during this period, he was called for an FAA interview in Des Moines at his home in Oregon and he sought reimbursement for the trip. The agency offered travel expenses from Chicago. The matter remained unsettled into September, 1979. By then he was advised that no payment would be made until his employment status was cleared up. The government challenges some of this scenario but does not dispute that there was an ongoing hassle over Naekel's vouchers.

Upon completing training early in the summer of 1979, Naekel was assigned to Chicago FSS. He asserts he had successfully sought positions elsewhere, which were blocked by Chicago. After a confrontation with his supervisor Mr. Imhoff in Chicago on July 17, he immediately returned to Oregon never having actually performed any work in Chicago. He asserts he quit at that interview. Mr. Imhoff was not produced as a witness. The agency (by a Mr. Funk) issued a notice of proposed removal from the Chicago FSS on July 20, 1979, effective August 25. Naekel never sought reinstatement to his Chicago position. By August 25, he was an employee of the State of Oregon, Military Affairs Department. The only open matter with the agency, as far as he was concerned, was reimbursement for travel.

Inexplicably, on Friday evening August 31, 1979, the agency sent a cryptic message apparently via its communication center operator to Naekel's home in Oregon. The telegram-style message, which was given to Naekel's wife over the telephone, consisted of two sentences. The first stated that the July 20 notice of removal and the removal decision were cancelled by Mr. Funk. The second directed Naekel to report to Chicago FSS on Tuesday, September 4, 1979. No explanation was given and no copy of the message was delivered to Naekel. When Naekel did not report as ordered on the following Tuesday morning,[5] Mr. Funk immediately issued a notice of proposed removal charging Naekel with being AWOL from July through and including September 5, 1979.

Under the circumstances here, the FAA's September 5 notice was a nullity. While the agency could unilaterally cancel the adverse action as far as Naekel's personnel records would show, it could not after August 25, the effective date of the end of his employment, make Naekel an employee without his consent. While the matter has not been addressed in MSPB cases, the Supreme Court has spoken in terms of tendering an "offer of employment" where a private industry employee is entitled to reinstatement following a termination. *See*

---

5. We note only as an aside that this time period spans the Labor Day weekend. A copy of the message in the agency file was ultimately produced and is in the record so that the Naekels' testimony as to the Friday night message is confirmed.

*Phelps Dodge Corp. v. National Labor Relations Board*, 313 U.S. 177, 190, 61 S.Ct. 845, 850, 85 L.Ed. 1271 (1941) (NLRB has power to require employment to be *offered* a worker who lost employment because of discrimination).

In our society no concept other than a person's agreement to employment is acceptable. The government is not exempt from the constitutional prohibition against involuntary servitude (U.S. Const. Amend. XIII). Thus, the August 31 "order" to report to Chicago must be transformed into an offer of re-employment if it is to have any dignity at all. Treated as an offer, we must examine Naekel's responses to see if there is any indication of acceptance.

On receipt of the Friday night message, Naekel immediately wrote Funk for verification and an explanation. In Naekel's letter of August 31, he expresses his legitimate concerns as follows:

I have been fired against my wishes. Chicago FSS is located some two-thousand, three-hundred miles from where I received the notice. Without some indication of the purpose for so directing me it could possibly be a very, very expensive office visit. That would not help the feelings I presently hold for the management people at Great Lakes Regional Headquarters.

I would suggest you immediately write or call. If FAA pays for the trip I will come immediately. If not, there will have to be a mighty good reason. Please consider and advise.

No acceptance can be found in this response. There was, therefore, no foundation for the September 5 removal notice.

By the same token, the September 15 letter containing words of resignation could legally be given only a *nunc pro tunc* effect. Moreover, considering its content, the import of the letter is *not* resignation from a job Naekel was then occupying. Naekel wrote Funk on September 15 in total frustration with the FAA. He had received no copy of the August 29 telegram, had had no reply to his August 31

letter, and understood there would be no payment of his outstanding vouchers until his employment status was settled. His September 15 letter makes no mention of the September 5 notice of proposed removal. To hold that the letter is a resignation sent to avoid being fired is a total mischaracterization. As stated in *Phelps Dodge Corp.*, 313 U.S. at 191, 61 S.Ct. at 851:

But this is a bit of verbal logic from which the meaning of things has evaporated.

His relationship with the FAA was over. He was not seeking reinstatement, but a definitive end. In layman's language, he stated that he resigned. The legal effect of the letter, however, was an unequivocal rejection of the agency's "offer." Thus, the charge that Naekel quit a job under threat of a *proposed* removal, as found by the presiding official, is unsupported by substantial evidence.

The presiding official erroneously then went on to hold that Naekel's argument that his employment ended before the September 5 and 15 communications, if correct as a matter of law, would make no substantive difference because Naekel did not report that he had been "fired" from this job. Not only did the presiding official improperly recast the specific charge, but also the August 31 rescission nullified the adverse action so that he was not "fired." Indeed, the agency has never asserted that Naekel was previously fired from the FAA.

Equally important here is the inadequate treatment of the element of intent with respect to this charge. There is no evidence that Naekel intentionally misled the agency. The official file was in the hands of the agency. Naekel's answer explaining why he left Chicago FSS was truthful in his statement that his employment was "mutually unsatisfactory." Moreover, he went on to set forth an extensive detailed explanation. He did not indicate either resignation or removal. One could not possibly know, in view of the agency's gross mishandling of the matter, just what his

official employment record would show.[6] Rather than concealment, his answer evidences disclosure of an ambiguous situation. In the face of that disclosure, no basis for drawing an inference of wrongful intent exists.

### Delayed Acceptance of Employment

In view of our conclusion that neither charge was proved, we will only briefly address Naekel's further assertion that he did not agree to accept the agency's offer of employment made in October, 1981, until the necessary checks of his employment record had been made. It is apparent that the presiding official misconstrued this defense as an assertion that the FAA extended an unconditional offer to Naekel, i.e., with a waiver of the necessary investigation.

Employment may be offered an applicant subject to completion of background investigations, and such an offer was initially made to Naekel. Naekel asserts that he did not wish to leave the security of his position in the private sector until he could be hired unconditionally, that is, after investigations were complete.[7] Regardless of what circumstances actually led to delay in Naekel's employment until December, the presiding official's rejection of his argument on the ground that the FAA could not legally make an unconditional offer of employment is non-responsive and cannot stand. However, we need not remand because of our disposition of the appeal in Naekel's favor.

### Conclusion

Taken as a whole, the evidence of record is insufficient to sustain the agency's charges that Gerald Naekel made false statements on his applications for employment. In the terms of the statute, we set aside the agency's action because it was arbitrary, capricious, and unsupported by substantial evidence. 5 U.S.C. § 7703(c)(3). The decision of the board is *reversed.*

Petitioner shall be entitled to reinstatement with full benefits, back pay, and costs. The board is directed to entertain a request for reasonable attorney fees.[8]

REVERSED.

---

6. Presumably it shows he resigned, since the agency does not assert that he was fired.

7. Naekel had been employed for several years by Penn-Aire Aviation, Inc. and was Director of Operations and Chief Pilot.

8. Petitioner, now appearing *pro se,* was represented by counsel during part of extended proceedings before the board.