# United States Court of Appeals for the Federal Circuit

2007-3261

RICHARD A. LEATHERBURY,

Petitioner,

v.

DEPARTMENT OF THE ARMY,

Respondent.

David H. Giggs, Dolan Griggs LLP, of Portland, Oregon, argued for petitioner.

Hillary A. Stern, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. On the brief were Jeanne E. Davidson, Director; Todd M. Hughes, Deputy Director; and Dawn S. Conrad, Trial Attorney. Of counsel on the brief was James R. Herald, Assistant District Counsel, Office of Counsel, Portland District, United States Army Corps of Engineers, of Portland, Oregon.

Appealed from: Merit Systems Protection Board

# United States Court of Appeals for the Federal Circuit

2007-3261

RICHARD A. LEATHERBURY,

Petitioner,

v.

DEPARTMENT OF THE ARMY,

Respondent.

Petition for review of the Merit Systems Protection Board in SF0752060100-I-1

_____

DECIDED:  April 29, 2008

_____

Before BRYSON, <u>Circuit Judge</u>, CLEVENGER, <u>Senior Circuit Judge</u>, and DYK, <u>Circuit Judge</u>.

DYK, <u>Circuit Judge</u>.

Richard A. Leatherbury ("Leatherbury") appeals a final decision of the Merit Systems Protection Board ("Board") upholding the Department of the Army's ("agency") removal of Leatherbury from his position with the U.S. Army Corps of Engineers. Because we conclude that one of the three charges sustained by the Board was not supported by substantial evidence, and that the Board improperly overturned credibility findings of the Administrative Judge ("AJ") on another charge, we reverse and remand.

## BACKGROUND

Leatherbury, at the time of his removal, held the position of Assistant Operations Manager for The Dalles, John Day, Willow Creek Project (the "Project") in the Army

Corps of Engineers' Portland, Oregon, District. In his 34 years of total experience in the federal service, 29 of which he served as a civilian with the agency, Leatherbury had not been disciplined prior to the charges that led to his removal.

The Project involved the operation of three hydroelectric dams located on the Columbia River east of Portland, Oregon. Leatherbury lived in The Dalles, Oregon, just west of The Dalles Dam, and maintained his regular duty station at the John Day Dam in Rufus, Oregon, to the east of The Dalles Dam. Leatherbury's daily commute took him right past The Dalles Dam on his way to the John Day Dam, located 24 miles east of The Dalles Dam along Interstate 84, which runs parallel along that stretch to the Columbia River. The events leading up to Leatherbury's dismissal can be summarized briefly.

I  The Overtime Claim

For many years, beginning in the early 1990s, Leatherbury transported Project mail on an informal basis during his morning and evening commutes between The Dalles Dam (which received the mail addressed to the John Day Dam from the Postal Service) and the John Day Dam. After stopping in the morning for the mail at The Dalles Dam, Leatherbury would exchange his personal vehicle for a government-owned vehicle to drive between the two work sites. His regular work shift began when he arrived at the John Day Dam. At the end of his regular shift at the John Day Dam, he would transport the outgoing mail to The Dalles Dam where it would be given to the Postal Service. Leatherbury continued transporting the mail between the two dams until January 2002, when the United Power Trade Organization ("the union") filed a

grievance against him based on his use of the government-owned vehicle. As a result of the grievance, Leatherbury's supervisors no longer allowed him to take the government-owned vehicle between sites, and Leatherbury stopped delivering the mail. Thereafter, bargaining unit employees took up the job of transporting mail between the work sites, and the agency paid them overtime compensation for their time.

Once Leatherbury and his supervisor, Terry Armentrout ("Armentrout"), learned that the bargaining unit employees were being paid overtime for transporting the mail between work sites, they began to inquire about the possibility of claiming back pay for the overtime hours that Leatherbury had spent delivering mail prior to the start of, and after the end of, his regular work shifts. Leatherbury and Armentrout contacted Robin Steward ("Steward"), the Administrative Officer for the Project, to determine whether Leatherbury could seek retroactive overtime compensation, and if so, what the procedures were for filing such a claim. Steward agreed that Leatherbury could submit a claim for overtime going back six years—the maximum period allowed by the statute of limitations.

In an email to Steward, Leatherbury requested that someone from administrative services prepare the appropriate paperwork, which he would review. In that email request, Leatherbury provided Steward with the type of information that he determined was relevant in compiling a request—average number of sick days, leave days, and other miscellaneous days that he estimated he had not transported mail. Leatherbury testified that "I wanted it constructed by others so that it would be impartially done." J.A. at 491. Steward agreed to have administrative services prepare the request, and delegated the task to Kathleen Mincks ("Mincks"), an office automation clerk. Using the

2007-3261                                3

relevant information that Leatherbury provided, Mincks prepared an informal typewritten one-page document entitled "Time History" detailing the number of hours that Leatherbury spent, on average, over the 1996-2001 time frame transporting mail. Armentrout drafted a cover memorandum entitled "Request for Overtime Pay for Dick Leatherbury" to accompany the Time History. Both Leatherbury and Armentrout reviewed the Time History, and Leatherbury reviewed the Armentrout memorandum before submitting both documents together to the District Office in Portland for approval. In late 2002, Leatherbury received a reimbursement check in the amount of $24,422.43 covering his claim for overtime reimbursement.

## II The Travel Reimbursement Claim

In January 2002, after Leatherbury ceased using a government-owned vehicle to transport mail between The Dalles Dam and the John Day Dam, he began using his own private vehicle to drive between the two dams. Often, Leatherbury would stop during business hours at The Dalles Dam on his way to work in the morning or on his way home in the evening to conduct official business. Leatherbury frequently made these stops to meet with other Project managers, including his direct supervisor, Armentrout, who was stationed at The Dalles Dam. Leatherbury tracked his travel mileage between the two dams when that travel was taken for official business purposes and during duty hours, and submitted that mileage to the agency in the form of local travel vouchers as a claim for reimbursement. Leatherbury submitted eleven separate vouchers over a two-and-a-half year period between January 14, 2002, and June 9, 2004, for a reimbursement amount totaling $1,257.57.

## III Proceedings Below

The agency issued a notice of proposed removal as finally amended on April 18, 2005. The notice included six charges, four of which were sustained by the deciding official and are pertinent to this appeal.

Charge 1, "Filing a False Claim Against the Government," was directed to Leatherbury's overtime claim and included three specifications. Specification 1 stated in part: "the representation that you [Leatherbury] transported the mail on a daily basis between 0600 and 0630, and between 1700 and 1730 is false. You knew or should have known that Mr. Armentrout included this false information in his memorandum when he transmitted your overtime claim to the [Resource Management Office]." J.A. at 666. Specification 2 stated in part:

> The 'Time History' . . . represented that you [Leatherbury] transported the mail . . . for an average of 155 overtime hours per year for six years . . . In fact, you transported the mail during overtime hours substantially less than 155 hours per year. You knew or should have known that the Time History falsely represented that you transported the mail during overtime hours an average of 155 hours per year. You provided the Time History to Mr. Armentrout with this false information with the intent of misleading the agency into paying you the amount claimed in reliance on the false information.

Id. at 666-67. Specification 3 accused Leatherbury of improperly claiming overtime compensation in the first place, given that the task was incidental to his normal daily commute.

Charge 2, "Filing a False Travel Voucher," included eleven specifications for each travel voucher that Leatherbury submitted claiming reimbursement for his travel mileage between the two work sites. The agency alleged that Leatherbury improperly claimed

and received reimbursement for his non-reimbursable commute to the John Day Dam—an expense not covered by the Joint Travel Regulations.

Charge 3, "Approving a Local Travel Voucher That Included Expenses That You Knew Or Should Have Known Were Not Reimbursable Under The Joint Travel Regulation," was directed to Leatherbury's approval of his subordinate's travel vouchers, which similarly included the disputed mileage between the two work sites.

Charge 6, "Claiming Overtime Compensation Not Covered By Federal Law," referred to three discrete instances in 1998 where Leatherbury claimed overtime compensation for work-related travel between his home in The Dalles and, on one occasion, Spokane, Washington, and on the two other occasions, Omaha, Nebraska. Charge 6 is not related to the circumstances that gave rise to Charge 1.

On October 4, 2005, Colonel Thomas O'Donovan issued a decision removing Leatherbury and sustaining the four charges described above—Charges 1, 2, 3, and 6. Leatherbury challenged his removal before the Board. An administrative judge ("AJ"), after a hearing, sustained the agency on Charge 3, but held that the agency had not proven by a preponderance of the evidence the elements of Charges 1, 2, and 6.

With respect to Charge 1, the AJ held that the agency failed to prove the first two specifications by a preponderance of the evidence, finding that Leatherbury could not have "supplied incorrect information" by submitting the overtime claim because the claim was merely an estimate. J.A. at 14. The AJ also held that the agency failed to prove that Leatherbury submitted the overtime claim with intent to defraud. The AJ concluded that he was "unconvinced that when [Leatherbury] approved the estimates alleged in Specifications 1 and 2, and allowed them to be submitted to the District Office

for further review, he acted either with specific intent to defraud the agency or with reckless disregard for the truth." J.A. at 16. In connection with specification 3, the AJ determined that the agency failed to show that Leatherbury "was guilty of fraudulent concealment," since he found that the agency "was well aware that the [overtime] claim covered trips that were part of [Leatherbury's] daily commute." J.A. at 17. The AJ therefore sustained none of the three specifications in Charge 1.

Turning to the travel vouchers, the AJ found that none of the 11 specifications in Charge 2 could be sustained. Here too, the AJ found that the agency had failed to show that Leatherbury submitted the travel vouchers "with intent to defraud." J.A. at 18. He determined that the agency was well aware of the nature of Leatherbury's commute (given the earlier controversy with the union over Leatherbury's use of the government-owned vehicle) and that he did not, therefore, attempt to conceal any material information from the agency. The AJ also found credible Leatherbury's testimony that he submitted the vouchers in good faith, concluding that it was "quite plausible that [Leatherbury] was honestly mistaken about his entitlement under the specific circumstances presented in these vouchers, and the evidence bears this out." J.A. at 19.

The AJ sustained charge 3, finding that the agency established that Leatherbury improperly approved his subordinate's travel vouchers that included the disputed mileage. In doing so, he noted that the charge differed from the other charges in that it did not include an element of intent, and was instead akin to a charge of negligence in the performance of Leatherbury's official duty.

Finally, the AJ held that Charge 6 could not be sustained, again finding that the agency failed to show that Leatherbury knowingly supplied false information or did so with an intent to defraud. The AJ then determined that the penalty of removal could not be upheld based solely on Charge 3, and accordingly mitigated Leatherbury's punishment to a written reprimand.

The agency petitioned the full Board for review. The full Board reversed the AJ's initial decision with respect to Charge 1, based on Specifications 1 and 2 (but not Specification 3), and Charge 2, and affirmed with respect to Charges 3 and 6.[1] With respect to Specifications 1 and 2 of Charge 1, the Board disagreed with the AJ that the overtime claim was in fact an estimate, finding that "the 'Time History' appears to represent an exact accounting of the overtime compensation owed to [Leatherbury] between 1996 and 2001." J.A. at 39. It concluded that Leatherbury "acted with reckless disregard for the truth or for ascertaining the truth with respect to Specifications 1 and 2," and that Leatherbury "knowingly supplied incorrect information with the intention of defrauding the agency." J.A. at 40. However, the Board agreed with the AJ that, because the agency was "well aware" that the overtime claim covered the trips that Leatherbury made as part of his daily commute, the agency failed to establish Specification 3 of Charge 1.

In sustaining Charge 2, the Board focused on the fact that Leatherbury was a Travel Approving Official, had attended a Travel Approving Official Class, was a supervisor responsible for approving his subordinates' travel vouchers, and had

---

[1] On appeal, the agency does not contest the Board's decision dismissing Charge 6, and Leatherbury does not contest the Board's decision sustaining Charge 3.

received a number of policy memoranda and an email regarding the general rule that employees must deduct their commuter mileage. The Board therefore concluded that "[b]ased on the totality of the circumstances . . . [Leatherbury] possessed a specific intent to defraud the government by submitting the false travel vouchers, or that he acted with a reckless disregard either for the truth or for ascertaining the truth . . . ." J.A. at 43.

The Board concluded that the agency's decision to remove Leatherbury from his position was reasonable "[i]n light of the nature of the sustained misconduct," J.A. at 47, and accordingly reinstated the penalty of removal imposed by the agency. Leatherbury timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

DISCUSSION

Our review of the Board's decision is limited and governed by statute. We may only set aside a decision of the Board if it is: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence[.]" 5 U.S.C. § 7703(c); Haebe v. Dep't of Justice, 288 F.3d 1288, 1298 (Fed. Cir. 2002).

Leatherbury challenges the Board's findings with respect to Charges 1 and 2. Leatherbury contends that, under both charges, the Board's findings are not supported by substantial evidence. Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Bradley v. Veterans Admin., 900 F.2d 233, 234 (Fed. Cir. 1990) (quoting

Universal Camera Corp. v. Labor Bd., 340 U.S. 474, 477 (1951)). On appeal, "[w]e must determine whether, considering the record as a whole, the agency's evidence is sufficient to be found by a reasonable factfinder to meet the evidentiary burden applicable to the particular case." Bradley, 900 F.2d at 234. "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Jacobs v. Dep't of Justice, 35 F.3d 1543, 1546 (Fed. Cir. 1994) (quoting Universal Camera, 340 U.S. at 488).

Both Charges 1 and 2 are based on allegations of falsification. Each involved an allegation that Leatherbury submitted a false statement prepared by another person—in the case of specification 1, a false statement by his supervisor (Armentrout), and in the case of specification 2, a false statement by the clerk who prepared the Time History (Mincks).

In order to sustain a charge of intentionally submitting false information, the agency "must prove by a preponderance of the evidence that the employee knowingly supplied wrong information, and that he did so with the intention of defrauding the agency." Naekel v. Dep't of Transp., 782 F.2d 975, 977 (Fed. Cir. 1986). In Naekel, we explained that the charge of falsification requires proof "not only [of a false statement], but also that [the false statement] was given with intent to deceive or mislead the agency." Id. at 978. A false statement alone "cannot control the question of intent." Id. Otherwise, "the 'intent' element of the charge would be subsumed within the distinct inquiry of whether the employee's [statement] adheres to the true state of facts." Id. The agency may establish an employee's intention to deceive or mislead the agency by

circumstantial evidence. <u>Kumferman v. Dep't of Navy</u>, 785 F.2d 286, 290 (Fed. Cir. 1986).

A charge that an employee knowingly supplied wrong information with an intent to defraud the agency requires first that the agency prove that the information submitted included a false statement. The test here is objective and is made without regard to the employee's subjective understanding or knowledge. Second, the agency must prove that the false statement was material. Third, the agency must show that the employee acted with the requisite intent. Our cases confirm that the intent element itself requires two distinct showings: (a) that the employee intended to deceive or mislead the agency, and (b) that he intended to defraud the agency for his own private material gain. <u>See</u> <u>Bradley</u>, 900 F.2d at 237 (finding the false statement motivated by a desire for privacy rather than a desire to defraud). Under the first intent prong (a), it is sufficient that the employee either knew that the submission included a false statement of material fact, or was reckless with respect to ascertaining the truth of the statement. <u>See</u> <u>Kumferman</u>, 785 F.2d at 290.

However, an employee's good faith explanation can negate an inference of intent to deceive or mislead the agency. <u>See</u> <u>Naekel</u>, 782 F.2d at 979-80; <u>Kumferman</u>, 785 F.2d at 290; <u>Dennis v. Dep't of Health & Human Servs.</u>, 804 F.2d 670, 673 (Fed. Cir. 1986) (finding credible an employee's explanation that she relied on supervisor instructions). Thus, a reasonable good faith belief in the truth of a statement precludes a finding that an employee acted with deceptive intent.

I

Leatherbury contends, with respect to Charge 1, that the Board's finding is not based on substantial evidence that his submission of the claim for overtime compensation was a false statement. We begin with the assumption for purposes of this appeal that Leatherbury did not engage in misconduct in making an overtime claim, because the Board found that he was reasonable in believing that he was entitled to make an overtime claim and did not sustain Specification 3 of Charge 1.

The Board's opinion is unclear as to whether it found a violation of Specification 1 and 2 based on: 1) the theory that it was not proper for Leatherbury to submit an overtime claim based entirely on an estimate, or 2) the theory that Leatherbury's overtime claim purported to be a precise calculation of actual time worked and not an estimate. We address each in turn.

As to the first theory, the Board apparently found that Leatherbury was not entitled to submit an estimate, stating that "[d]espite having not kept time and attendance records by which he could have calculated the amount of overtime incurred over the preceding years, the appellant nonetheless set out to formulate a claim against the government." J.A. at 39. It then appeared to fault Leatherbury for transferring the task of generating an estimate to administrative personnel without any records. It stated: "rather than calculating the time figures himself, the only person in a position to possibly know the precise amount of overtime worked, [Leatherbury] transferred the

task of completing the 'Time History' to administrative personnel, who would have had no way of knowing how much time he actually spent working overtime." Id. [2]

We are at a loss to understand how an employee could be said to engage in misconduct by submitting an overtime claim based on an estimate so long as the estimate was reasonable. In a related context, courts have approved of estimates to satisfy an employee's burden of proof in cases brought under the Fair Labor Standards Act ("FLSA") seeking unpaid wages or overtime compensation. See, e.g., Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1946) superseded by statute on other grounds as stated in United States v. Cook, 795 F.2d 987, 990-91 (Fed. Cir. 1986); Arias v. U.S. Serv. Indus., Inc., 80 F.3d 509, 511 (D.C. Cir. 1996). In cases where an employer has failed to keep accurate records in accordance with FLSA requirements:

> an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

Anderson, 328 U.S. at 687-88 (emphases added). We conclude that Leatherbury was entitled to submit an estimate for his overtime claim.

Nor can the Board's decision be sustained on the second theory—that Leatherbury's submission was not an estimate but rather an exact calculation. The Board concluded:

---

[2] Notably on appeal the government admits that "there were not [any] records of when Mr. Leatherbury worked overtime transporting the mail . . . ." Appellee's Br. at 28.

[N]owhere in the "Time History" did [Leatherbury], or anyone else, note that the figures and calculations presented in the document, apart from perhaps the interest rates cited and [Leatherbury's] 1996 salary, were mere estimates; instead, the "Time History" appears to represent an exact accounting of the overtime compensation owed to the appellant between 1996 and 2001. The dollar figures presented in the "Time History" were calculated to the exact penny, without any hint or acknowledgment that the figures were anything less than a complete, accurate, and truthful representation of the overtime compensation owed to [Leatherbury].

J.A. at 39-40 (internal citations omitted) (emphases added). We disagree.

Leatherbury's overtime claim, as reflected in the Time History, was clearly intended to be an estimate. Leatherbury testified without contradiction that the overtime claim was intended to be an estimate. Also, Mincks, the administrative clerk who actually prepared the Time History, testified that she understood that what she was preparing was an estimate. J.A. at 369 ("It was trying to figure out an estimate of what days might be that he [Leatherbury] had come to John Day."). The language used in the Time History itself reveals that it was an estimate of the amount that Leatherbury thought he was entitled to, and not a precise determination of such an amount. [3]

---

[3] The Time History in its entirety provides:

Time History for Dick Leatherbury

In figuring out the time that Dick Leatherbury spent conducting government business, carrying the mail to and from John Day Dam, the following figures have been used.

If one counts the number of possible regular work days in one calendar year, the total would be 208 days.

208 work days in a calendar year would include:

- 21 vacation days
- 10 holidays
- 2 sick days

The Time History is a one-page document.  It begins: "In figuring out the time that Dick Leatherbury spent conducting government business . . . the following figures have been used."  J.A. at 647.  It then sets out that "[i]f one counts the number of possible regular work days in one calendar year, the total would be 208 days."  Id. (emphasis added).  It then lists the average number of vacation days, holidays, sick days, and miscellaneous time away from the Project that Leatherbury would have been expected to take in any given year.  It states specifically that the "hours for the years 1997 through 2002 have been averaged out for one year."  Id.  From there, it determines that on average, Leatherbury would have transported mail 155 days each year, resulting in

- 20 miscellaneous time away from Project on official government business
- 155 days that Mr. Leatherbury took the mail from The Dalles to John Day and back from John Day to The Dalles Dam. This would be 310 one trips at ½ hour each totaling 155 hours.

It is necessary to go back six years for a correct compensation calculation. There are no Salary Tables prior to 1997. The hours for the years 1997 through 2002 have been averaged out for one year. The following is based on the GS 10 step 1 at the overtime rate for each year.

Also, of consideration is the issue of interests [sic] rates. The determination is difficult to calculate, as we do not know how the rate is calculated.  Is it calculated monthly, quarterly, yearly, or at what determination level.

| YEAR | HOURLY WAGE | TOTAL X 155 hours | INTERSEST RATE | INTEREST TOTAL | GRAND TOTAL |
|---|---|---|---|---|---|
| Averaged Year | $26.33 | $4,081.15 | 7.75 Average | $316.28 | $4,397.43 |
| 1997 | $24.54 | $3,803.70 | 8.0 | $304.29 | $4,107.99 |
| 1998 | $25.25 | $3,913.75 | 7.25 Average | $283.74 | $4,197.49 |
| 1999 | $26.15 | $4,053.25 | 8.0 | $324.26 | $4,377.51 |
| 2000 | $27.36 | $4,240.88 | 9.0 | $381.67 | $4,622.55 |
| 2001 | $28.34 | $4,392.70 | 7.25 Average | $318.47 | $4,711.17 |
| | TOTAL | $24,485.43 | TOTAL | $1928.71 | $26,414.14 |

J.A. at 647.

310 one-way trips. Each trip, according to the Time History, would take on average about thirty minutes. The Time History concludes with a table, which includes a row for each of the six prior years, an average hourly wage, and an average interest rate. The average hourly wage is multiplied by 155 hours to determine what Leatherbury would have been paid each year that he felt entitled to overtime. The table then adds an adjustment for interest to each year, and sums the total dollar amount for each year to arrive at the grand total of $26,414.14.

There is nothing in the document that purports to be a precise calculation of the actual number of hours that Leatherbury worked in any given year. Instead, the Time History makes clear that all the numbers used are averages and are based on assumptions. There is also evidence that the deciding official (reviewing Leatherbury's proposed removal) recognized that it was an estimate. In the Memorandum Notice of Decision on Leatherbury's Proposed Removal, Colonel O'Donovan expressly refers to the overtime submission as an "estimate." See J.A. at 198 ("The evidence of a reckless disregard for the facts includes your use of an estimate[ and] your failure to use actual data to support your claim[.]") (emphasis added). Finally, the Armentrout Memorandum itself suggests that the overtime claim was an estimate. In it, Armentrout refers to Leatherbury picking up the mail "at about 6:00 A.M." and returning it "at about 5:30." J.A. at 651 (emphases added). There is, therefore, no support for the Board's conclusion that the Time History falsely purported to be an exact calculation.

Accordingly, substantial evidence does not support a finding that the statements made by Leatherbury in his overtime claim were false, and we do not reach the question

of whether substantial evidence supports a finding that he submitted the claim with an intent to defraud the agency.

II

Leatherbury also asserts that substantial evidence does not support the Board's finding that he filed a false travel voucher with an intent to deceive or mislead the agency. Under this charge, Leatherbury does not dispute that he was not entitled to reimbursement for the mileage claimed in the submitted travel vouchers under the agency's reading of the Joint Travel Regulations. Instead, Leatherbury claims that he had a reasonable good faith belief that he could seek reimbursement for the disputed mileage, and that he could not have been reckless with regard to the truth because of that reasonable good faith belief.

The AJ found credible Leatherbury's testimony that "he submitted the[] vouchers . . . in good faith, and did not understand that they were contrary to the [Joint Travel Regulations]." J.A. at 18. He also found credible Leatherbury's testimony that he did not actually read the relevant documents that the agency had circulated describing the Joint Travel Regulations policy. Moreover, the AJ explained that "the agency did not show that [Leatherbury's travel] training covered the relatively arcane situation presented in these vouchers; i.e., where use of [a privately owned vehicle] duplicates part of the local commute but takes place during duty hours rather than before or after the work day; it begins and ends on agency property, the employee has official business at both locations, and could otherwise have used a [government owned vehicle] to drive the same miles." J.A. at 19. The AJ concluded that, based on Leatherbury's testimony, the nature of his position as an engineer, and the limited

extent of his travel regulations training, that "it is quite plausible that [Leatherbury] was honestly mistaken about his entitlement . . . ." Id.

The Board disagreed. It relied on the evidence establishing that Leatherbury was designated as a Travel Approving Official, had attended a training course entitled "Travel Approving Official Class" covering the general rule that an employee must deduct his normal daily commute from local travel vouchers, and had received multiple policy memoranda serving to remind employees of the general rule regarding deduction of commuter mileage. The Board concluded that "[b]ased on the totality of the circumstances, it appears more likely to be true than untrue that either the appellant possessed a specific intent to defraud the government by submitting the false travel vouchers, or that he acted with a reckless disregard either for the truth or for ascertaining the truth in the matter." J.A. at 43.

The general rule is that the Board is free to substitute its judgment for that of one of its administrative judges. Connolly v. U.S. Dep't of Justice, 766 F.2d 507, 512 (Fed. Cir. 1985). An important exception, however, is that the Board is not "free to overturn an administrative judge's demeanor based credibility findings merely because it disagrees with those findings." Haebe, 288 F.3d at 1299. This requirement to defer to the AJ's credibility findings "spring[s] from a fundamental notion of fairness . . . [that] great deference must be granted to the trier of fact who has had the opportunity to observe the demeanor of the witnesses, whereas the reviewing body looks only at 'cold records.'" Id. (quoting Jackson v. Veterans Admin., 768 F.2d 1325, 1331 (Fed. Cir. 1985)).

We explained in Haebe that where "an administrative judge [is] able to observe the demeanor of a testifying witness and, as a result, the administrative judge's findings [are] explicitly or implicitly based on the demeanor of the witness," "the Board may not simply disagree with the AJ's assessment of credibility . . . unless the board has articulated sound reasons, based on the record, for its contrary evaluation of the testimonial evidence." Haebe, 288 F.3d at 1300 (quoting Kimm v. Dep't of Treasury, 61 F.3d 888, 892 (Fed. Cir. 1995). "[I]f the [Board's] reasons for overturning demeanor-based credibility determinations are not sufficiently sound, its decision does not survive substantial evidence review." Id. at 1301. Thus, absent an adequate explanation, the Board may not "substitute its judgment on issues of credibility based on the demeanor of the witness." Id. at 1302.

The AJ's findings in this case, crediting Leatherbury's explanation, were implicitly based on a credibility finding. Here, Leatherbury testified in person and explained his good faith belief. The record in this case does not support a finding that the AJ's credibility determination was unreasonable. There is no direct evidence that Leatherbury was actually aware that the mileage he was claiming was not reimbursable under the regulations. The only support for rejecting Leatherbury's explanation is the oral advice that he received that commuter expenses were not reimbursable and the various publications sent to Leatherbury stating that commuter travel must be deducted. But for the most part, the publications were addressed to situations in which the employee traveled from home to a different work place and then home again. They were not generally addressed to Leatherbury's situation, where he started at an alternate work site and claimed travel from there to his regular work site. There was

only one example in the various publications received by Leatherbury—an example in the Joint Travel Regulations—that even approaches the unique circumstances of Leatherbury's commute, and that example itself was not crystal clear.[4]

Even more significant, despite the evidence that Leatherbury received the various publications, the AJ specifically found that Leatherbury did not read these documents, and that Leatherbury did not understand the policy to bar reimbursement. While Leatherbury may have been familiar with the general rule that commuting expenses were not reimbursable, the AJ found that Leatherbury did not receive training that covered the specific situation involved here. The Board did not find otherwise. There is therefore no basis to infer that Leatherbury read and understood the single example in the Joint Travel Regulations on which the agency places its primary reliance or that he received similar specific advice orally. Leatherbury also made no effort to conceal the basis for his claim, and his supervisor, Armentrout, was well aware of the basis for the claim. Indeed, Armentrout testified that Armentrout himself also (mistakenly) understood the Joint Travel Regulations to allow such a claim for

---

[4] One of the examples given in the Joint Travel Regulations provides:

Employee's one-way commuting distance to regular place of work is 12 miles. In the morning the employee drives to an alternate work site (45 miles). In the afternoon the employee returns to the regular place of work (67 miles). After completion of work employee returns to residence, a distance of 12 miles.

In this case the employee is entitled to be reimbursed for the distance that exceeds the normal round trip commuting distance (24 miles). The employee is reimbursed for 100 miles (45 + 67 + 12 - 24 = 100).

J.A. at 82. We note that in the example the employee's reimbursement exceeds the 67 miles traveled between the two job sites.

reimbursement, and that he told Leatherbury that he should file the disputed claims. Armentrout approved each of the travel vouchers at issue. Under these circumstances, there was no basis for the Board to overturn the AJ's credibility finding as to Leatherbury's good faith.

We find that the Board failed to give the AJ the deference required by Haebe and impermissibly reversed the AJ's credibility determination that Leatherbury had a reasonable good faith belief. Charge 2, therefore, cannot be sustained.

CONCLUSION

We find that the Board's conclusion with respect to Charge 1, that Leatherbury submitted a false overtime claim, is not supported by substantial evidence. We also find that the Board's conclusion with respect to Charge 2, that Leatherbury submitted false travel vouchers, is not supported by substantial evidence because, without justification, it overturned a credibility finding made by the AJ. The Board's conclusion that Leatherbury violated Charge 3 stands. Because the only charge sustained is Charge 3, and because the AJ determined that the penalty of removal is not warranted on that charge alone—an issue not addressed by the full Board—we reinstate the AJ's penalty of a written reprimand.[5] We therefore reverse and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

No Costs.

---

[5] The AJ made a credibility finding that he did not believe the testimony of deciding official O'Donovan, who asserted that the agency would have removed Leatherbury based solely on any one of the charges in question.