**Jeffrey M. HATHAWAY, Petitioner,**

v.

**DEPARTMENT OF JUSTICE, Respondent.**

No. 03–3288.

United States Court of Appeals, Federal Circuit.

Sept. 16, 2004.

Thomas G. Roth, of West Orange, NJ, argued for petitioner.

Brent M. McBurney, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for respondent. With him on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Donald E. Kinner, Assistant Director. Of counsel on the brief was Toby D. McCoy, Senior Attorney, Drug Enforcement Administration, of Washington, DC. The principal attorney was Claudia Burke, Civil Division.

Before SCHALL, GAJARSA, and DYK, Circuit Judges.

SCHALL, Circuit Judge.

Jeffrey M. Hathaway petitions for review of the final decision of the Merit Systems Protection Board ("Board") sustaining his removal from employment with the Department of Justice's Drug Enforcement Administration ("DEA" or "agency"). *Hathaway v. Dep't of Justice,* 95 M.S.P.R. 295 (M.S.P.B.2003). In its final decision, the Board denied Mr. Hathaway's petition for review of the initial decision of an administrative judge ("AJ") upholding all three charges brought by DEA, as well as the penalty of removal. *Hathaway v. Dep't of Justice,* No. BN–0752–01–0215–I–2 (M.S.P.B. Apr.17, 2002) ("*Initial Decision*").

Because we conclude that only one of the three charges against Mr. Hathaway is supported by substantial evidence, the decision of the Board sustaining his removal is reversed. The case is remanded to the Board for further proceedings relating to an appropriate penalty for the remaining charge.

## BACKGROUND

### I.

At the time of his removal, Mr. Hathaway was employed as a Criminal Investi-

gator, GS–9. In that position, he worked as a vehicle fleet manager in the Boston, Massachusetts office of DEA. *Initial Decision* at 1. He was removed from his position based on three charges relating to his application for employment with DEA: (1) conduct prejudicial to DEA, (2) omission of material information from official documents, and (3) false statements. *See id.* at 2–6.

The sequence of events that led to Mr. Hathaway's removal began in 1996. During that year, he applied for employment with several federal law enforcement agencies, specifically the United States Customs Service, the United States Marshals Service,[1] the Federal Bureau of Investigation ("FBI"), the Immigration and Naturalization Service ("INS"), and DEA, where he sought to be an investigator.

In May of 1996, Mr. Hathaway underwent a polygraph examination in connection with his FBI application. Both the polygraph examination and the accompanying written application presented questions designed to ensure that any past illegal drug use by the applicant fell within FBI guidelines. Uncertain about what qualified as "use," Mr. Hathaway asked for clarification. According to Mr. Hathaway, he was told to consider "any and all" instances that he was around illegal drugs as "use." Applying this definition to his personal experience, Mr. Hathaway confirmed that his use of marijuana fell within the FBI's acceptable range by initialing the statement on the written application, "Ap-

plicant cannot have used cannabis more than fifteen (15) times in his life." Mr. Hathaway was then interviewed by FBI Special Agent ("SA") Matthew Cronin, at which time he indicated he had complied fully with FBI guidelines concerning the use or sale of illegal drugs. Mr. Hathaway passed the polygraph examination.

By letter dated June 24, 1996, the FBI informed Mr. Hathaway that he would not be offered a position. The letter did not specify why his application had been denied:

> FBI appointments are offered on a very selective basis due to the large number of applicants and the limited number of positions available. Each application, therefore, receives a thorough review and each candidate's qualifications are carefully weighed.

> In reaching any decision, information from a variety of sources is considered. These sources include your application itself, comments obtained during the investigation and public source records. The choices between the many qualified candidates are difficult ones, and I regret that we are unable to offer you a more favorable decision.

Believing that he had been rejected on account of a meritless assault charge,[2] Mr. Hathaway requested reconsideration of his application in July of 1996.

During this same period, Mr. Hathaway pursued employment with INS. As part of his application to that agency, he was

---

1. In 1994, while a student at Northeastern University, Mr. Hathaway applied for and received an internship position with the Marshals Service. The internship was conducted through the University's cooperative education program with the Marshals Service.

2. Earlier that year, an assault charge was pressed against Mr. Hathaway by a friend of an ex-roommate. Although criminal proceedings were initiated against Mr. Hathaway, they were conclusively resolved in his favor; the case was dismissed and Mr. Hathaway's record expunged.

again questioned about past illegal drug use. On September 12, 1996, Mr. Hathaway submitted a Standard Form 86 ("SF–86") providing general background information, including a description of his past drug use ("1996 INS SF–86"). On this application, when asked the "number of times" he had used illegal drugs, Mr. Hathaway wrote that between June, 1991, and December, 1991, he had used marijuana "no more than 10 times." In November of 1996, INS hired Mr. Hathaway as an immigration inspector.

On May 9, 1997, Mr. Hathaway was notified that the FBI had again rejected his application. Still believing the assault charge to have been the reason for his rejection, Mr. Hathaway sought additional explanation from the FBI. He was told by FBI personnel to obtain additional work experience, further his education, learn another language, and reapply at a later date. Nevertheless, in an effort to determine the reasons for his rejection, Mr. Hathaway filed a Freedom of Information Act ("FOIA") request with the FBI.

Although employed by INS, Mr. Hathaway continued to seek a position as an investigator with DEA. On June 6, 1997, he submitted a SF–86 to that agency ("1997 DEA SF–86"). In it, he provided a response to the illegal drug use question that allegedly differed from the one he had given to the FBI. Apparently because he now understood that "use" referred only to actual consumption, Mr. Hathaway wrote that in June of 1991, he had used marijuana five times. Polygraphed once more, Mr. Hathaway passed the illegal drug use question. As part of the DEA SF–86, Mr. Hathaway also was required to disclose other instances where he had been the subject of a federal background investigation. In the space provided, Mr. Hatha-

way listed the 1996 application to INS and his application to the Marshals Service in April of 1994. However, he did not disclose the unsuccessful FBI application. DEA hired Mr. Hathaway in October of 1997.

In early 1998, Mr. Hathaway decided to apply for the position of special agent within DEA. On February 19, 1998, he submitted an additional SF–86 ("1998 DEA SF–86"). He again stated that he had used marijuana five times in June of 1991. In the section pertaining to his investigations record, Mr. Hathaway listed the 1994 U.S. Marshals, 1996 INS, and 1997 DEA applications, but again omitted the FBI application. On August 7, 1998, Mr. Hathaway submitted to another polygraph examination with DEA. He passed, after answering negatively the question, "Have you intentionally withheld any information from your drug use statement?" Mr. Hathaway was hired as a special agent in the fall of 1998, and began training at the DEA Academy in Quantico, Virginia, in February of 1999.

Within days of his arrival at the DEA Academy, however, an altercation at a bar in Georgetown involving one of his classmates changed the path of Mr. Hathaway's career at DEA. Although Mr. Hathaway was cleared of any wrongdoing in the incident, he was immediately reassigned from the Academy to DEA's Boston office. There, over a period of approximately two years, he worked in the Technical Operations Division and as vehicle fleet manager, with the expectation that he would eventually return to the Academy in a future class. In 1999, DEA's Office of Professional Responsibility ("OPR") commenced an investigation of alleged inconsistencies in Mr. Hathaway's various SF–86 applications. The alleged inconsisten-

cies related to his past illegal drug use and prior applications with government law enforcement agencies. Mr. Hathaway was twice interviewed by OPR about these alleged inconsistencies.

## II.

On January 23, 2001, Joel K. Fries, the deciding official for the Human Resources Division of DEA ("Human Resources"), notified Mr. Hathaway that he was proposing his removal from his current position. Mr. Fries based his proposed removal action on three charges: (1) conduct prejudicial to DEA; (2) omission of material information from official documents; and (3) false statements. Each charge was supported by several independent specifications.[3]

For charge 1, there were three specifications relating to alleged inconsistent statements made by Mr. Hathaway. Specification 1 cited an inconsistency between Mr. Hathaway's purported statement to SA Cronin during his May 1996 FBI polygraph examination "that [he] had used marijuana on 15 occasions during the period of 1990 to 1992," and his statement on the 1996 INS SF–86 "that [he] had used marijuana 10 times during the period from June 1991 to December [19]91." *Id.* at 2–3. Specification 2 noted Mr. Hathaway's 1997 DEA SF–86, where he "stated that [he] had used marijuana 5 times in June 1991," and charged Mr. Hathaway based on an asserted inconsistency between that statement and his previous statements to SA Cronin and on his 1996 INS SF–86. *Id.* at 3. Specification 3 was prompted by Mr.

Hathaway's statement on his 1998 DEA SF–86 "that [he] used marijuana five times in June 1991." *Id.* Mr. Fries charged that this assertion was inconsistent with Mr. Hathaway's earlier statements to SA Cronin and on his 1996 INS SF–86.

The second charge brought against Mr. Hathaway was omission of material information from official documents. Two specifications supported this charge; both related to Mr. Hathaway's failure to disclose his FBI application to DEA and INS in his application for employment with those agencies. Specification 1 charged Mr. Hathaway with "omitt[ing] the material fact that [he] had been the subject of a [background investigation] by the FBI which [he] knew might not have been favorable" from his 1997 DEA SF–86. Specification 2 charged Mr. Hathaway with that same omission from his 1998 DEA SF–86.

Charge 3, false statements, was the most serious of the three charges. All four specifications in the charge were premised on DEA's claim that Mr. Hathaway knew, from his FBI correspondence and FOIA request, that he had been rejected by the FBI because of his "repeated pattern of poor judgment and abuse of position." Therefore, when Mr. Hathaway later denied knowledge of the reasons for his rejection, those denials amounted to false statements. Statements made by Mr. Hathaway in his two interviews with OPR were the focus of charge 3.

Specifications 1 and 2 grew out of Mr. Hathaway's sworn statement to OPR investigators on September 7, 1999. The following statement, made in that inter-

---

**3.** Prior to Mr. Fries' decision to propose Mr. Hathaway's removal, OPR's investigation of Mr. Hathaway was independently reviewed by DEA's Board of Professional Conduct ("BPC"). On May 23, 2000, BPC recom- mended to Human Resources that Mr. Hathaway be cleared of all charges. As his January, 2001 letter indicates, Mr. Fries disagreed with BPC's conclusion and continued to pursue the charges.

view, formed the basis for the first specification: "I applied to the FBI. I didn't get that job. They didn't give me a concrete reason. I applied for the Freedom Information, and that basically was—they didn't give me any reason why I didn't get the job." Specification 2 recounted a similar statement from the September 7 interview:

> I received a short letter that said, "Sorry, you're not selected at this time." So from there, I filed with the Freedom of Information Act to find out why I wasn't selected, and it was basically useless information that I got. It didn't specifically say why I didn't get the position.

Specifications 3 and 4 grew out of a second interview Mr. Hathaway had with OPR investigators on July 7, 2000. Specification 3 referred to the portion of that interview where OPR investigators asked Mr. Hathaway why he had "fail[ed] to inform the Drug Enforcement Administration that [he] had been the subject of a background investigation by the FBI[.]" Mr. Hathaway responded that

> [t]here's no real reason I've never listed any of the FBI. I've never had any negative confrontation with the FBI or nothing negative ever resulted in that. There was no explanation why I—I didn't list that. Just reading this, I mean it seems like I at the point listed, you know, everything that I've ever applied for, whether it got left off or whatnot. There's no bearing of why I left it off. I've never had, you know, I never had a negative reason to leave it off. It doesn't make sense.

Specification 4 recited a similar question-and-answer:

> [OPR Investigator]: To recap—and you tell me if this is a fair statement—you're unaware of any negative information un-

covered about you from the background investigation done by the FBI. Is that correct?

> [Mr. Hathaway]: Correct.

Because Mr. Hathaway was purportedly aware of specific negative information developed in the course of his FBI background investigation, DEA charged that the above statements were falsehoods.

By letter dated February 26, 2001, Mr. Hathaway responded to the three charges against him. On July 31, 2001, a new deciding official for Human Resources, James F. Getz, found "that the charges [we]re fully supported by the evidence," and that Mr. Hathaway's removal was "warranted ... to promote the efficiency of the service." Mr. Hathaway's removal was effective August 3, 2001.

### III.

Mr. Hathaway timely appealed his removal to the Board. Following a hearing, the AJ to whom the appeal was assigned issued an initial decision sustaining the removal. On the first charge, conduct prejudicial to DEA, the AJ found that "it [was] clear from the fact of the various SF–86s submitted by the appellant that the information he provided to the questions pertaining to drug usage was, in fact, different." *Initial Decision* at 9. This inconsistency was, in the AJ's view, prejudicial to DEA because it "minimized [Mr. Hathaway's] value as a future government witness in drug prosecutions and, by extension, his usefulness to the DEA whose agents are in the business of investigating drug cases and ultimately testifying in those cases." *Id.* at 11. On this point, the AJ relied on the testimony of Robert Spelke, the Associate Chief Counsel of DEA's Domestic Criminal Law Section.

Mr. Spelke was responsible for DEA compliance with *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), a Supreme Court case establishing that investigative agencies must turn over to prosecutors, as early as possible in a case, potential impeachment evidence with respect to the agents involved in the case. Under *Giglio*, the prosecutor then exercises his or her discretion as to whether that impeachment evidence is submitted to the defense. Mr. Hathaway's inconsistent statements, in Mr. Spelke's opinion, would render him a "*Giglio*-impaired" agent of marginal value to DEA.

The AJ also sustained the second charge, omission of material information from official documents. As seen, this charge related to Mr. Hathaway's failure to disclose on his 1997 and 1998 DEA SF–86s his 1996 application for employment with the FBI. Before the AJ, Mr. Hathaway did not dispute the omission, but instead argued that it was inadvertent. The AJ found that an unintentional omission was, on its own, sufficient to support the charge, noting that "the appellant's explanation that he inadvertently omitted the information may be relevant for purposes of penalty mitigation, but such, evidence does not exonerate the appellant from the charged misconduct where intent is not an essential element of the charge." *Id.* at 12.

The AJ then reviewed the charge of false statements. The AJ correctly observed that, in order to sustain this third charge, the agency had to "prove by preponderant evidence that the employee provided incorrect information and that the incorrect information was provided with the intent to deceive or mislead the agency." *Id.* at 13 (citing *Deskin v. United States Postal Serv.*, 76 M.S.P.R. 505, 510 (1997)). Applying this standard, the AJ found that only two of the four specifications, specifications 3 and 4, were supported.[4] As noted above, these specifications grew out of Mr. Hathaway's interview with OPR investigators on July 7, 2000, in which he stated that he was not aware of any negative information about him in the FBI investigation. From Mr. Hathaway's FBI rejection letters, the AJ surmised that Mr. Hathaway must have known "negative information was floating around which may have impacted his chances at the FBI." *Id.* at 16. In that case, Mr. Hathaway's statements that he was aware of "nothing negative" in his FBI application would be, as the AJ found, "patently false." *Id.* The AJ then proceeded to find that Mr. Hathaway had intentionally concealed this negative information from DEA. Specifically, the AJ pointed to Mr. Hathaway's failure, subsequent to his FBI rejection, to list the FBI investigation on his applications to *other federal agencies.* Looking at the totality of the circumstances, the AJ concluded that "it is clear that once the appellant did not land his 'dream job' with the FBI, most likely because of negative information acquired during the background investigation, [he] made a calculated decision not to disclose his contacts with the FBI to any other law enforcement agencies to which he applied." *Id.* at 18.

Although the AJ had found two of the four specifications in the most serious charge, false statements, to be unsupport-

---

4. The government has not appealed the Board's decision with respect to specifica- tions 1 and 2.

ed, he nevertheless concluded that the duplicity of Mr. Hathaway's actions justified his removal: "In the final analysis, because the appellant's misconduct was serious and strikes to the very heart of his duties as a Criminal Investigator and because a law enforcement officer is held to a higher standard of conduct than other employees ... removal was reasonable." *Id.* at 20. The penalty was therefore sustained.

This appeal followed after the Board denied Mr. Hathaway's petition for review for failure to meet the criteria for review set forth in 5 C.F.R. § 1201.115. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9).

## ANALYSIS

### I.

We review the Board's decision to ensure that it is not (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c) (2000); *Stearn v. Dep't of the Navy,* 280 F.3d 1376, 1380 (Fed.Cir.2002). Mr. Hathaway challenges the Board's decision to sustain charges 1 and 3.

### II.

We turn first to charge 1, conduct prejudicial to DEA. Here, in both specifications, DEA alleged that Mr. Hathaway had inconsistently portrayed the extent of his illegal drug use. The AJ described the conflicts in Mr. Hathaway's descriptions of

his drug use as "undisputed." *Initial Decision* at 8. The AJ understood Mr. Hathaway to have made the following conflicting statements: (1) that he " 'personally experienced' marijuana *on 15 occasions* " (FBI polygraph examination); (2) that he "used marijuana *10 times* " (1996 INS SF–86); and finally (3) that he "used marijuana *5 times* " (1997 and 1998 DEA SF–86s). *Id.* Significantly, Mr. Spelke's opinion with respect to Mr. Hathaway's *Giglio* status was conditioned on this view of the facts:

> [M]y understanding is that on the SF–86's, they're sworn statements. *And my understanding from the reading the record is that Mr. Mr. Hathaway said, at one point it was 15 times, 10 times, and five times,* if I'm not mistaken. Somewhere along the line, something's inconsistent there, and I would disclose that, yes.

(emphasis added).

 We do not agree with Mr. Spelke's and the AJ's characterization of Mr. Hathaway's statements. Before his FBI polygraph examination, Mr. Hathaway initialed that he had used illegal drugs *"no more than* 15 times" (emphasis added); at the same time, on the 1996 INS SF–86 he stated that he had used illegal drugs *"no more than* 10 times" (emphasis added). The only instance in which Mr. Hathaway provided a definitive figure, rather than a range, was on the 1997 and 1998 DEA SF–86s. There, he specified that he had used illegal drugs five times. The number five falls within *both* the "no more than 15" and "no more than 10" ranges. There is no inconsistency or conflict among the figures provided by Mr. Hathaway to the various agencies.[5]

---

5. We also note that any variation in Mr. Hathaway's answers appears to correspond to differing timeframes. For example, on his 1997 INS SF–86, the number recited by Mr. Hatha-

The government effectively conceded this point at oral argument. When pressed by the court, counsel admitted that "5," "no more than 10," and "no more than 15," were not inconsistent. Without inconsistency, there could be no prejudice to DEA. Confronted with this problem, the government agreed that "[a]rguably, yes," charge 1 had to be dismissed. That is the result we now reach. Because we conclude that charge 1 was not supported by substantial evidence and therefore cannot be sustained, we reverse the decision of the Board on that charge.

### III.

We turn next to charge 3, the false statements charge. The AJ sustained specifications 3 and 4 of the four specifications in the charge. In support of specifications 3 and 4, the government relies on two items—the June 24, 1996 and May 9, 1997 rejection letters from the FBI to Mr. Hathaway.[6] According to the government, these letters signaled to Mr. Hathaway that the FBI had uncovered derogatory information about him. Thus, the government argues that when Mr. Hathaway told OPR investigators on July 7, 2000, that he

was unaware of negative information resulting from his FBI background investigation, he perpetrated a falsehood.

■ A charge of falsification is established when the agency demonstrates first that the applicant provided incorrect information, and second that the incorrect information was provided with the intent to mislead or deceive the agency. *Naekel v. Dep't of Transp.*, 782 F.2d 975, 977 (Fed. Cir.1986); *see also Ludlum v. Dep't of Justice*, 278 F.3d 1280, 1284 (Fed.Cir.2002) ("Falsification involves an affirmative misrepresentation, and requires intent to deceive."). We begin by considering whether Mr. Hathaway's statements in his July 7, 2000 interview—that he was unaware of any negative information that may have prompted the FBI rejection—were indeed factually inaccurate. To answer this question, we must ascertain whether the FBI rejection letters, the only sources on which the government relies, placed Mr. Hathaway on notice of any specific negative information.

■ In the first letter, dated June 24, 1996, the FBI explained that its decision was based in part on "information from a variety of sources" that included "[Mr.

---

way reflected use between June and December of 1991. Later, on his 1997 and 1998 DEA SF–86s, Mr. Hathaway referred to a more narrow window of use that occurred only in the month of June of 1991. Because the amount of use could differ depending on the timeframe, this distinction supports our view that Mr. Hathaway's statements were not inconsistent.

6. When charging Mr. Hathaway, DEA appeared to rely on more than just these two letters. In the background to charge 3, Mr. Fries referred to an August 12, 1996 FBI "Report of Investigation" that he believed had been provided to Mr. Hathaway as part of the response to his FOIA request. That letter explained that "the FBI was discontinuing

[Mr. Hathaway's] BI due to derogatory information due to the fact that 'the applicant has displayed a repeated pattern of poor judgment and abuse of position'. That document list[ed] 4 areas of concern including a nonrecommendation for hiring." Before the AJ, Mr. Hathaway maintained that this letter was not included in the FOIA response and that there was no showing that the document had been provided to him. The AJ agreed, and excluded the August 12, 1996 letter from consideration. On appeal, the government appears to have acceded to this ruling, and relies totally on the June 24, 1996 and May 9, 1997 letters to support DEA's action removing Mr. Hathaway.

Hathaway's] application itself, comments obtained during the investigation and public source records." Other than noting that these sources had been considered, the June 24 letter did not specify any "negative information" that led to Mr. Hathaway's rejection. On the contrary, the letter went on to say that, "[t]he choices between the many qualified candidates are difficult ones," implying that Mr. Hathaway was among such qualified candidates. The same generality is found in the May 9, 1997 FBI rejection letter. While this correspondence described Mr. Hathaway as "noncompetitive," it did so in highly broad terms—citing only "[t]he totality of an applicant's background investigation and the veracity of the information found during this review. . . ." It too failed to highlight any specific negative information that had prompted the rejection of Mr. Hathaway's application.

We disagree with the AJ and the government that these letters would have placed Mr. Hathaway on notice of any derogatory information. To be sure, Mr. Hathaway would have understood from the mere fact of his rejection by the agency that his application had been viewed unfavorably, but he would not have known exactly what had led the FBI to its decision. Thus, it cannot be said that when Mr. Hathaway spoke to OPR investigators in the July 7, 2000 interview, he spoke falsely when he stated that he did not have a "negative reason" to omit the FBI background investigation (specification 3), and that he was "unaware of any negative information uncovered about [him] from the background investigation done by the FBI" (specification 4).

On appeal, the government urges that "[t]he best evidence of [Hathaway's] state of mind [wa]s his own effort to get the FBI

to reconsider." The government states: "Not only did he write to offer an explanation of an assault charge, but he also had others intervene upon his behalf to try and overcome the decision." We agree with the government that, had Mr. Hathaway asserted that he was unaware of any possible bases for his rejection while failing to mention the assault charge, he would have spoken falsely. However, that was not the case. Not only did Mr. Hathaway disclose the assault charge to the OPR investigators in the July 7 interview, but he discussed how it may have related to his FBI rejection:

> At the time I thought—I thought I didn't get hired because I had that mess with my old roommate who, you know, wasn't paying his phone bill and there was an altercation with his friend from home and all that. I figured that was the reason they didn't hire me. They didn't specifically say that. You know, when I talked to them they said "No. No. That's not it. Go out and get me some more experience," and all that.

This statement by Mr. Hathaway follows just a few pages in the interview transcript after the statements that are the focus of specifications 3 and 4. Because a full disclosure was made by Mr. Hathaway to the OPR investigators, we fail to see how his earlier statements could be considered falsehoods. In expressing that he was aware of no negative information arising from his FBI application, Mr. Hathaway could only have meant *other than* the assault charge.

Because we do not find the statements listed in specifications 3 and 4 to be factually inaccurate, we need not reach the question of Mr. Hathaway's intent. Charge 3 is not supported by substantial evidence; the decision of the Board with respect to the charge is therefore reversed.

## IV.

■ We do not understand Mr. Hathaway to contest the Board's finding on charge 2. Mr. Hathaway has consistently acknowledged that an omission occurred when he failed to disclose on his DEA SF–86s that he had been the subject of a background investigation by the FBI. As the AJ noted, it is irrelevant to the finding of an omission whether that omission was intentional or unintended. The AJ upheld charge 2 based on an unintentional omission, and the government does not argue intent on appeal. We therefore sustain the AJ's determination that an unintended omission occurred. Charge 2, then, the least serious of the three charges, is the only charge that we sustain on appeal.

■ In the situation where not all charges brought against an employee are upheld, any previous penalty may be called into question. This court's recent decision in *Guise v. Department of Justice,* 330 F.3d 1376 (Fed.Cir.2003), speaks to the situation before us in this case. *Guise* dealt with two different situations. The first one is where the agency indicated that it would have imposed a different penalty if fewer than all the charges were sustained. In such a case, remand to the agency is required. Here the DEA did not indicate that it desired a lesser penalty be imposed should the Board decline to sustain any of the charges brought against Mr. Hathaway. The second situation is where, as here, the agency gave no indication that it would have imposed a lesser penalty. In such a case, *Guise* requires that we consider "the number and seriousness of the charges sustained as compared to the number and seriousness of those that have not been sustained." *Id.* at 1381. When the most serious charges or a majority of the charges have been invali-

dated, it may be appropriate for us to "vacate[ ] the penalty and remand[ ] for reconsideration of the penalty in light of the significant change in the number and seriousness of the sustained charges." *Id.* (citations omitted); *see also Southers v. Veterans Admin.,* 813 F.2d 1223, 1226 (Fed.Cir.1987) (remanding to the Board where the "bulk of the charges ha[d] been reversed" with the direction that the penalty of removal be considered).

■ Our precedent in *Lachance v. Devall,* 178 F.3d 1246 (Fed.Cir.1999), requires that in such circumstances the case return to the Board rather than the agency. Although the Board cannot "independently institute a new penalty" because that would violate the agency's sole discretion to determine penalty, *id.* at 1258–59, the Board does have the authority to "mitigate the maximum reasonable penalty so long as the agency has not indicated either in its final decision or during proceedings before the Board that it desires a lesser penalty to be imposed on fewer charges," *id.* at 1260. That being the case, under *Lachance,* the case may be remanded to the Board for a possible mitigation of the penalty to be imposed. *See Russo v. United States Postal Serv.,* 284 F.3d 1304, 1310 (Fed.Cir.2002).

■ In the case before us, there is no question that, under the *Guise* standard, a remand is required. The two most serious charges, charges 1 and 3, have been reversed, while the least serious charge, an inadvertent omission, is the only charge we have sustained. Furthermore, we cannot say that the AJ would have upheld the penalty of removal based just on charge 2. Significantly, the AJ stated that the first charge, conduct prejudicial to DEA, would, on its own, *"certainly be insufficient* to

warrant the maximum possible sanction of removal," and the AJ relied on the combined severity of the three charges to affirm the penalty. *Initial Decision* at 20 (emphasis added). The "significant change in the number and seriousness" of the charges against Mr. Hathaway requires that we remand to the Board in this case. *Id.*

## CONCLUSION

For the reasons set forth above, we reverse the final decision of the Board with respect to charges 1 and 3. We therefore remand the case to the Board for further proceedings relating to the penalty to be imposed.

*REVERSED and REMANDED.*