# United States Court of Appeals for the Federal Circuit

---

**ROBERT WESLEY SMITH,**
*Petitioner*

**v.**

**GENERAL SERVICES ADMINISTRATION,**
*Respondent*

---

2018-1604

---

Petition for review of the Merit Systems Protection Board in No. AT-0752-17-0470-I-1.

---

Decided: July 19, 2019

---

JOHN THOMAS HARRINGTON, The Employment Law Group, PC, Washington, DC, argued for petitioner. Also represented by ROBERT SCOTT OSWALD.

JESSICA R. TOPLIN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by LISA LEFANTE DONAHUE, ROBERT EDWARD KIRSCHMAN, JR., JOSEPH H. HUNT.

---

Before WALLACH, TARANTO, and STOLL, *Circuit Judges*.

STOLL, *Circuit Judge*.

Mr. Robert Smith worked at the General Services Administration for nearly 30 years before GSA removed him. Mr. Smith appealed that decision to the Merit Systems Protection Board, asserting that the agency failed to show his actions warranted removal and that the agency had retaliated against him for his repeated disclosure of gross mismanagement and waste.

The Board agreed that Mr. Smith was a whistleblower and that his protected disclosures contributed to the agency's decision to remove him. The Board nevertheless affirmed the agency's decision. Without addressing evidence relevant to the agency's motive to retaliate or its treatment of other similarly situated non-whistleblowers— legal error in itself—the Board ruled that because the agency had introduced strong evidence of misconduct, removal was justified. In doing so, the Board conflated two distinct inquiries: whether the agency's penalty was reasonable and whether the agency would have imposed that same penalty *absent* Mr. Smith's protected whistleblowing. This was error. The Board additionally erred in sustaining certain charges. Accordingly, we reverse those charges, affirm others, and vacate the Board's decision. We remand for it to address the merits of Mr. Smith's whistleblower defense, as well as the agency's chosen penalty, under the proper legal standards.

### BACKGROUND

Mr. Smith began working at GSA in 1989. Over the course of his career, he worked in various realty and financial management positions, eventually becoming a Senior Financial Advisor. For much of his career, Mr. Smith received positive performance evaluations and faced no discipline. In each of his fiscal year evaluations from 2006 through 2015, Mr. Smith received either "highly" or "fully successful" ratings, and in 2011, Mr. Smith received a National Achievement Award for Asset Management.

Over time, Mr. Smith became concerned that GSA was under-collecting rent and ineffectively managing its assets. He began sending emails to the agency's regional leadership describing these issues and advocating change. *See, e.g.*, J.A. 818–19 (asserting region was "$47 million behind" in billing in April 2012), 822–956 (providing 134 pages detailing management failures in March 2014), 978–1039 (arguing agency should "[r]eview the consistency in which all regions have applied . . . national policies and procedures" in July 2014), 1943–44 (describing "[t]he Road to Ineffective Management" in November 2014).

As Mr. Smith continued to send these emails, his immediate supervisors began restricting his ability to correspond directly with upper management. In late 2014, his second-line supervisor informed him that sending such "message[s] to the Regional Commissioner was inappropriate." J.A. 1940. And his then first-line supervisor wrote that because "the tone of many of your communications . . . is inappropriate" and "concerns have been raised regarding the accuracy of [your] information":

> [A]ny communication that you wish to transmit (verbally or electronically) to managers outside of the [group] *must be approved by me* <u>before</u> doing so. Please note that failure to comply with these instructions may result in disciplinary action.

J.A. 961 (first emphasis added); *see also* J.A. 1948 (reiterating "[a]ny communication that you wish to transmit (verbally or electronically) to managers outside of [standard management channels] must be approved by me <u>before</u> doing so").

In 2015, GSA reorganized, and Mr. Smith received a new first-line supervisor and a revised position description. Mr. Smith understood his new position description to eliminate any communication restriction. Though his new supervisor reiterated that "your new Position Description does not supersede the communication instructions you

received via e-mail on December 11 and 12, 2014 from [your previous supervisor]," J.A. 1932–33, Mr. Smith nevertheless sent another email to upper management in December 2015. The 87-page document, titled "Performance Diagnostic: A Guide to Move the Region to Performance Sustainability," identified areas of mismanagement and offered strategies to recapture lost rents and reduce inefficiencies. J.A. 1848–1930. Additional emails followed in January and February 2016.

In February 2016, Mr. Roman Augustus became Mr. Smith's immediate supervisor. In March, he again instructed Mr. Smith to "please communicate and coordinate with me via email prior to generating, compiling and forwarding any reports, direction, data requests or analytical narratives to the region." J.A. 513. Shortly thereafter, Mr. Augustus proposed that Mr. Smith be suspended for his failure to follow his previous supervisors' similar communication instructions. The agency imposed that suspension in June 2016.

Over the spring and summer of 2016, Mr. Smith's and Mr. Augustus's relationship became increasingly contentious. Mr. Augustus complained that Mr. Smith failed to timely forward documents, and Mr. Smith responded by email "[c]all me a liar—or just confront me with any mild infraction of your rules—I can handle it." J.A. 1840. During meetings, Mr. Smith challenged Mr. Augustus's authority, stating, "[y]ou are my administrative supervisor," "[y]ou cannot self-direct me," "[d]on't put regulations on me," J.A. 371–72, "[y]ou're not supposed to be giving me tasks," and "I am next to you, not under you," J.A. 378–79. In a letter, Mr. Smith complained to human resources that Mr. Augustus's management approach amounted to "dictates or child-like amonmondisshments [sic]." J.A. 1614. And in another document, Mr. Smith urged agency officials that "moving forward, [Mr. Augustus] is prohibited from interfering with the duties, obligations, and authorities as promulgated in the [2015 revised position description]."

J.A. 4. Mr. Augustus felt that on each of these five occasions, Mr. Smith had been disrespectful.

Mr. Augustus responded by informing Mr. Smith that "such conduct will not be tolerated and may result in disciplinary action." J.A. 1840. He reprimanded Mr. Smith for failing to follow instructions regarding how and when tasks should be completed. And he issued a record of infraction, accusing Mr. Smith of violating GSA's information technology ("IT") policy by leaving his computer access card ("PIV" card) unattended in his laptop in his cubicle. Mr. Augustus did not acknowledge that Mr. Smith, a quadriplegic, had never removed the PIV card from his laptop because he was physically unable to do so.

On September 14, 2016, Mr. Augustus proposed removing Mr. Smith from his position. Mr. Augustus charged Mr. Smith with failure to comply with IT policy, failure to follow supervisory instructions, and disrespectful conduct towards a supervisor.[1] The deciding official determined that "the reasons for [the] proposed removal fully support and justify" removal, and the agency removed Mr. Smith from his position. J.A. 1664.

II

Mr. Smith appealed to the Board, arguing that the charged conduct did not merit discipline and that the agency was retaliating against him for his whistleblowing. *See* 5 U.S.C. §§ 7511–15; 5 C.F.R. § 1201.3(a)(1). The Administrative Judge ("AJ") agreed that Mr. Smith was a whistleblower because of his December 2015 "Performance Diagnostic" disclosure. The AJ further found that, based on the timing, a reasonable person could conclude that Mr. Smith's disclosure contributed to the agency's decision to remove Mr. Smith. Nevertheless, the AJ affirmed GSA's

---

[1] A fourth charge, absence without leave, was not sustained by the Board and is not at issue on appeal.

decision, concluding that the government had shown by clear and convincing evidence that it would have removed Mr. Smith regardless of his whistleblowing.

The AJ began by considering the charges. The agency supported the charge of failure to comply with IT policy with a single specification that described Mr. Smith's failure to remove his PIV card from his laptop. The AJ found that Mr. Smith had notice of the IT policy and did not dispute that he failed to remove his PIV card from his laptop as required by that policy. Though it was undisputed that Mr. Smith could not physically remove his PIV card from his laptop, the AJ further found that Mr. Smith was not protected by the IT policy's exception for persons with disabilities.

The AJ also sustained the charge of failure to comply with supervisory instructions. GSA identified three incidents supporting the charge: that Mr. Smith had sent a short email on a weekend despite direction by Mr. Augustus not to work on weekends, and that Mr. Smith had twice failed to timely forward documents to Mr. Augustus in the manner instructed. The AJ found that in all three instances, Mr. Smith admitted both that he had received instructions from Mr. Augustus and that he had not followed them.

Similarly, the AJ sustained the charge of disrespectful conduct, which relied on the five previously discussed statements made by Mr. Smith to Mr. Augustus. Mr. Smith admitted to making each of the statements, and the AJ found that all five were "rude, discourteous, defiant, and/or challenging or undermining the authority of his supervisor, Roman Augustus." J.A. 4.

The AJ found an "obvious nexus" between the sustained charges and the efficiency of the service. J.A. 13. And though he had not sustained a fourth charge, the AJ nevertheless found that given the seriousness of the sustained charges and Mr. Smith's prior suspension on similar

grounds, the agency's decision to remove Mr. Smith was not unreasonable.

The AJ acknowledged that even though he had found the penalty reasonable, the agency's decision could not be upheld if Mr. Smith proved his affirmative defense of whistleblower reprisal. The AJ found that Mr. Smith had met his burden of showing both that he was a whistleblower and that his statutorily protected disclosures contributed to GSA's decision to remove him. But in two sentences, the AJ ruled that:

> [B]ased on the strength of the agency's evidence . . . it proved by clear and convincing evidence that it would have taken the same personnel action (removal) absent any disclosure. Indeed, I find that the defiantly disrespectful misconduct described . . . alone would have justified his removal, especially in light of his previous suspension for similar misconduct.

J.A. 21–22.

The AJ's decision became the final decision of the Board, *see* 5 C.F.R. § 1201.113, and Mr. Smith timely sought review in this court, *see* 5 U.S.C. § 7703. We have jurisdiction. 28 U.S.C. § 1295(a)(9).

## DISCUSSION

By statute, we must "hold unlawful and set aside" actions, findings, or conclusions of the Board if they are (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. 5 U.S.C. § 7703(c); *see Cobert v. Miller*, 800 F.3d 1340, 1347–48 (Fed. Cir. 2015). We review the Board's legal conclusions de novo and its fact findings for substantial evidence. *See Campbell v. Merit Sys. Prot. Bd.*, 27 F.3d 1560, 1564 (Fed. Cir. 1994).

## I

We first address the Board's treatment of Mr. Smith's whistleblower defense. Because the Board applied an incorrect legal standard and ignored relevant evidence, we vacate its decision.

## A

Statute prohibits an agency from penalizing its employees for whistleblowing. *See* 5 U.S.C. § 2302(b)(8). An employee who believes he has been subjected to illegal retaliation must prove by a preponderance of the evidence that he made a protected disclosure that contributed to the agency's action against him. *See Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012). "If the employee establishes this *prima facie* case of reprisal for whistleblowing, the burden of persuasion shifts to the agency to show by clear and convincing evidence that it would have taken 'the same personnel action in the absence of such disclosure.'" *Id.* at 1364 (quoting 5 U.S.C. § 1221(e)). If the agency does not show by clear and convincing evidence that it would have taken the same action absent the whistleblowing, the agency's penalty cannot be affirmed. *See Siler v. Envtl. Prot. Agency*, 908 F.3d 1291, 1298 (Fed. Cir. 2018). In determining whether the agency has carried its burden, we have instructed the Board to consider three nonexclusive factors:

> [1] the strength of the agency's evidence in support of its personnel action; [2] the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and [3] any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

*Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).

## B

Here, the Board's discussion of the *Carr* factors is all of two sentences:

> I further find based on the strength of the agency's evidence that it proved by clear and convincing evidence that it would have taken the same personnel action (removal) absent any disclosure. Indeed, I find that the defiantly disrespectful misconduct described . . . alone would have justified his removal, especially in light of his previous suspension for similar misconduct.

J.A. 21–22. While the first sentence states the correct legal standard, the Board did not provide any analysis of the *Carr* factors. Moreover, the second sentence applies an incorrect standard, averring that Mr. Smith's misconduct alone justified the agency's action. Contrary to the Board's statement, the merits of a whistleblower defense do not turn on the strength of the agency's evidence alone or on whether the misconduct justified removal. Those points speak to whether the agency met its burden to prove that misconduct occurred, discipline is warranted, and the chosen penalty is reasonable, factors the agency must show by preponderant evidence in every appeal from a disciplinary action. *See Pope v. U.S. Postal Serv.*, 114 F.3d 1144, 1147 (Fed. Cir. 1997); *see also Hale v. Dep't of Transp.*, 772 F.2d 882, 885 (Fed. Cir. 1985).

Where whistleblowing is at issue, however, the proper inquiry is not whether the agency action is justified; it is whether the agency would have acted in the same way absent the whistleblowing. *See Miller v. Dep't of Justice*, 842 F.3d 1252, 1257 (Fed. Cir. 2016) ("The issue [in a whistleblower reprisal case] is whether substantial evidence supports the Board's determination that the Government showed independent causation by clear and convincing evidence."). "[T]he merits cannot be the determinative factor that there was no reprisal. *A meritorious adverse action*

*must be set aside where there is reprisal.*" *Siler*, 908 F.3d at 1298–99 (quoting *Sullivan v. Dep't of the Navy*, 720 F.2d 1266, 1278 (Fed. Cir. 1983) (Nies, J., concurring)). Thus, the Board's independent decision to sustain the disrespectful conduct charge—however strong the underlying evidence—did not eliminate Mr. Smith's reprisal defense. And it does not excuse the Board from analyzing the entire record and determining whether the agency clearly and convincingly proved that it would have removed Mr. Smith even absent his whistleblowing, not merely that it could have justifiably done so. On remand, the Board must ensure that the agency is held to its "high burden of proof." *See Whitmore*, 680 F.3d at 1367 (quoting 135 Cong. Rec. H747–48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20)).

C

The Board further erred by failing to consider *Carr* factors 2 and 3 when analyzing whether the agency clearly and convincingly proved that it would have removed Mr. Smith notwithstanding his whistleblowing. Though we have explained that *Carr* imposes no affirmative burden on the agency to *produce* evidence for each of the three factors, *see Whitmore*, 680 F.3d at 1374, the Board cannot ignore record evidence relevant to the existence and strength of any motive to retaliate or the treatment of similar employees. Rather, the Board must "provide an in depth review and full discussion of the facts to explain its reasoning." *Id.* at 1368. This is especially true in a case such as this one, where the record contains ample evidence relevant to these factors.

The Board should have considered the evidence relevant to the strength of the agency's motive to retaliate. Mr. Smith made a number of disclosures, most of which the Board failed to address. *See, e.g.*, J.A. 818–19 (asserting region was "$47 million behind" in billing in April 2012), 822–956 (providing 134 pages detailing management

failures in March 2014), 978–1039 (arguing agency should "[r]eview the consistency in which all regions have applied . . . national policies and procedures" in July 2014), 1943–44 (describing "the road to ineffective management" in November 2014), 1160–61 (requesting workload review in January 2016), 1988–95 (asserting need for workload reform in February 2016). The agency introduced evidence that it had legitimate concerns regarding the accuracy and tone of these emails, which may cut against a finding of motive. But it is also true that management repeatedly threatened Mr. Smith with discipline if he continued to disclose perceived mismanagement outside of his immediate reporting chain.[2] *See* J.A. 961 ("[A]ny

---

[2] Indeed, though Mr. Smith did not seek recovery based on his supervisor's communication restriction in this case, its breadth may independently violate the Whistleblower Protection Act, which may in turn suggest a strong motivation on the part of the agency to silence Mr. Smith. *See* 5 U.S.C. § 2302(b)(8). The Act prohibits a "personnel action" against an employee because of any information disclosure by such employee which the employee reasonably believes evidences (i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. *Id.* The statute includes and protects "any" disclosure that an employee "reasonably believes" evidences misconduct or mismanagement. *Id.* § 2302(b)(8)(A); *Greenspan v. Dep't of Veterans Affairs*, 464 F.3d 1297, 1305 (Fed. Cir. 2006). And "the implementation or enforcement of any nondisclosure policy" is a prohibited "personnel action." 5 U.S.C. § 2302(a)(2)(A)(xi). The agency's order that any communication that Mr. Smith wished to transmit to managers outside of the group must be *approved by* a supervisor was a nondisclosure policy that

communication . . . to managers outside of the [group] must be approved by me <u>before</u> doing so. Please note that failure to comply with these instructions may result in disciplinary action."). And though Mr. Smith's work evaluations had been generally positive prior to his whistleblowing, his managers in fact suspended him and then placed him on a performance plan because of his communications and disclosures. Further, the record suggests that agency managers were unhappy with Mr. Smith and were embarrassed by his whistleblowing. In response to one of Mr. Smith's disclosures, the deciding official replied to her colleagues:

> Oh my gosh! So, what is the status of the action with HR? We need to take action immediately! This is absolutely unacceptable . . . . I'm embarrassed that he is representing [the group].

J.A. 1987 (ellipsis in original). In another email, Mr. Augustus "urge[d] [Mr. Smith] . . . to avoid deviating from or distorting verifiable facts in an effort to advance your subjective motives." J.A. 1843. The Board erred by failing to address this evidence.

Similarly, the Board should have considered the agency's failure to introduce evidence relevant to *Carr* factor 3—treatment of non-whistleblowers who engaged in similar misconduct. Though Mr. Smith was punished for working over a weekend, the undisputed record indicates at least one of Mr. Smith's colleagues completed weekend work on the same weekend as Mr. Smith. But the record does not reflect whether that colleague was penalized in any way. To the extent the agency failed to introduce evidence on how this employee or other similarly situated employees were treated, *Carr* factor 3 cannot support the

---

restricted Mr. Smith's ability to make such communications.

agency. *See, e.g.*, *Siler*, 908 F.3d at 1299 (holding that where there is "an absence of relevant comparator evidence, the third *Carr* factor cannot favor the government"); *Miller*, 842 F.3d at 1262 ("[T]he court may not simply guess what might happen absent whistleblowing. The burden lies with the Government."); *Whitmore*, 680 F.3d at 1374 ("Failure to [introduce comparator evidence] may be at the agency's peril.").

## D

Accordingly, we vacate the Board's whistleblower analysis and remand for it to apply the appropriate legal standard and consider the relevant evidence.

## II

We next review the Board's decision to sustain the charges against Mr. Smith, which we review for substantial evidence. *See Long v. Soc. Sec. Admin.*, 635 F.3d 526, 530 (Fed. Cir. 2011). To determine whether substantial evidence supports the Board, we must determine whether "considering the record as a whole, the agency's evidence is sufficient to be found by a reasonable factfinder to meet the [agency's] evidentiary burden." *See Leatherbury v. Dep't of the Army*, 524 F.3d 1293, 1300 (Fed. Cir. 2008) (quoting *Bradley v. Veterans Admin.*, 900 F.2d 233, 234 (Fed. Cir. 1990)). It is not enough that record evidence exists that, if "viewed in isolation, substantiate[s] the Board's findings." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 478, 488 (1951). Instead, we set aside the Board's decision if we "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." *Id.* at 488. "Any determination by [the Board] that is based on findings made in the abstract and independent of the evidence which fairly detracts from [its] conclusions is unreasonable and, as such, is not supported by substantial evidence."

*Whitmore*, 680 F.3d at 1376. We address each of the three sustained charges in turn.

A

First, the Board's decision to sustain the charge of failure to comply with IT policy lacks substantial evidence support. The parties do not dispute that, to prove this charge, the agency was required to show that the employee failed to follow a proper, applicable policy. The agency asserted that Mr. Smith violated IT policies applicable to him when he failed to remove his PIV card from his laptop. In affirming the agency's charge, the Board cited evidence favorable to the agency's position. It noted that the policy requires users to remove PIV cards from their laptops, that Mr. Smith was trained in the IT policy, and that Mr. Smith did not remove his PIV card.

We conclude, however, that the record lacks substantial evidence to show that this policy was applicable to Mr. Smith. The relevant policy states that "[a]ny person with a disability that does not allow the individual to utilize a PIV card and laptop" is within the "groups of users [that] *are* exempt" from the requirement to use a PIV credential. J.A. 1827 (emphasis added). The AJ held that this exemption applies only to employees unable to use a PIV card *and* a laptop. Based on his interpretation, the AJ concluded that because Mr. Smith was not facially exempt from the policy and further failed to request a special exemption, he failed to show that his supervisors condoned him leaving his PIV card in his laptop.

We disagree with the AJ's unreasonable interpretation of the policy. Moreover, the fact that Mr. Smith failed to request a special exemption from the IT policy does not resolve the issue of whether his supervisors condoned his actions, creating a de facto exemption. It is undisputed that Mr. Smith is a quadriplegic. It is undisputed that Mr. Smith's supervisors were aware that he is a quadriplegic. Oral Arg. at 19:57–20:40, http://oralarguments.cafc.

uscourts.gov/default.aspx?fl=2018-1604.mp3 (conceding supervisors "knew that [Mr. Smith] had challenges with dexterity" and "knew that he would have difficulty" complying with IT policy). It is undisputed that he cannot physically remove a PIV card. Until the summer of 2016, Mr. Smith had never been corrected by his supervisors for failing to remove his PIV card and accordingly, he believed himself to be exempt from the PIV IT policy because of his disability. J.A. 365–68 (stating second supervisor was aware of Mr. Smith's inability to remove PIV card because the supervisor had assisted Mr. Smith in moving offices), 436 (first supervisor agreeing she had never seen Mr. Smith remove a PIV card); Oral Arg. at 20:49–22:45 (conceding agency introduced no evidence contradicting Mr. Smith's testimony on these points). The Board failed to address this evidence. On this record, substantial evidence does not support the Board's decision to sustain this charge, and we reverse the Board's decision sustaining this charge.

## B

Second, the Board's decision to sustain the weekend work specification, offered by the agency in support of its failure to follow supervisory instructions charge, similarly lacks substantial evidence support. In sustaining the agency's specification, the Board stated that Mr. Augustus had instructed Mr. Smith not to work over the weekend and that two days later, Mr. Smith nevertheless sent an email over the weekend. While each point is facially correct, the Board's analysis is defective. Proof of a failure to follow instructions charge requires the agency to show that an employee failed to follow a proper instruction, *see Hamilton v. U.S. Postal Serv.*, 71 M.S.P.R. 547, 556 (1996), but the Board failed to discuss the propriety of Mr. Augustus's instruction, despite facts that draw it into question. The agency introduced no formal policy forbidding weekend work, no evidence that other employees had been instructed to not work on the weekend, and no supporting

rationale for imposing this ban on Mr. Smith alone. Oral
Arg. at 36:41–37:52. Moreover, it was undisputed that
Mr. Smith had regularly worked over the weekend to
timely complete work due to his health issues; that the
email at issue was written during business hours and re-
quired only minutes to complete over the weekend; and
that he sent the email over the weekend only because an-
other employee first sent him information over the week-
end.[3]    In light of the whole record, the Board's
determination is unsupported by substantial evidence. Ac-
cordingly, we reverse the Board's decision as to this speci-
fication.

We affirm the Board's decision to sustain the remain-
ing specifications of the failure to follow instructions
charge. But because we have reversed the Board's findings
on one of the specifications underlying that charge, on re-
mand, the Board must determine whether the charge as a
whole may be sustained.

C

We also affirm the Board's decision sustaining the dis-
respectful conduct charge. Mr. Smith urges us to hold that
the Board also erred in its consideration of the specifica-
tions related to that charge, but for each, Mr. Smith merely
argues that circumstances excused his disrespectful con-
duct. *See* Pet'r's Br. 30–37. Though, as discussed below,
the Board must consider any mitigating circumstances in
its penalty analysis, substantial evidence supports the
Board's decision to sustain the specifications themselves.
*See Webster v. Dep't of the Army*, 911 F.2d 679, 684
(Fed. Cir. 1990) (affirming Board decision to sustain
charges where findings were "undisputed by [petitioner],
who admits to the conduct alleged but offers excuses").

---

[3]    The record does not indicate whether Mr. Smith's
coworker was similarly disciplined for his weekend work.

## III

Finally, we consider the Board's decision that the agency acted reasonably in removing Mr. Smith. In determining the reasonableness of the penalty imposed by an agency, the Board considers the factors outlined in *Douglas v. Veterans Administration*, 5 M.S.P.B. 313 (1981). The penalty chosen by the agency must represent a responsible balancing of the relevant *Douglas* factors. Mr. Smith argues that the agency's analysis of the eleventh *Douglas* factor, "mitigating circumstances surrounding the offense," which include "unusual job tensions, personality problems, . . . or bad faith, malice or provocation on the part of others involved in the matter," *id.* at 332, was deficient and that the Board erred in affirming the agency's penalty.

We do not reach this specific argument. The Board did not sustain all of the charges and we have concluded that others are not supported by substantial evidence. We have also vacated the Board's analysis of Mr. Smith's whistleblower defense. If, on remand, the Board concludes that the agency would not have removed Mr. Smith absent his whistleblowing, "the agency's removal decision may not stand." *Siler*, 908 F.3d at 1298, 1300 ("The Board has no discretion to affirm a penalty tainted by illegal reprisal, even if the agency's penalty might otherwise have been reasonable."); 5 U.S.C. § 7701(c)(2)(B). And if, on remand, the Board concludes otherwise, the Board must consider whether to mitigate the penalty in light of our reversal of certain charges. *See, e.g.*, *Hathaway v. Dep't of Justice*, 384 F.3d 1342, 1353 (Fed. Cir. 2004).

Accordingly, we vacate the Board's decision as to the reasonableness of the penalty. *See Wrocklage v. Dep't of Homeland Sec.*, 769 F.3d 1363, 1371 (Fed. Cir. 2014). On remand, the Board must consider whether the penalty of removal may be sustained or whether remand to the agency is necessary to reassess the appropriate penalty. In addition, the Board must perform a thorough analysis of

the mitigating circumstances identified by Mr. Smith—
particularly that the statements underlying the disrespect-
ful conduct charge were based on his belief that Mr. Augus-
tus was acting contrary to Mr. Smith's position description.
*See, e.g.*, Pet'r's Br. 30–37. The Board should also consider
the propriety of the breadth of Mr. Smith's supervisors'
communication bans in evaluating the reasonableness of
any penalty. *See, e.g.*, J.A. 961 ("*[A]ny communication* that
you wish to transmit (verbally or electronically) to manag-
ers outside of the [group] *must be approved by me . . . .*"
(emphases added)), 513 ("[C]ommunicate and coordinate
with me via email prior to generating, compiling and for-
warding *any* reports, direction, data requests or analytical
narratives to the region." (emphasis added)).

## CONCLUSION

We have considered the parties' remaining arguments
and find them unpersuasive. For the reasons above, we
vacate the Board's decision and remand for reconsideration
of Mr. Smith's reprisal defense and the agency's chosen
penalty.

### AFFIRMED-IN-PART, REVERSED-IN-PART, VACATED AND REMANDED

## COSTS

Costs to petitioner.